961 A.2d 786

**COMMONWEALTH of Pennsylvania, Appellee**

v.

**Roland William STEELE, Appellant.**

Supreme Court of Pennsylvania.

Submitted March 27, 2003.

Decided Dec. 18, 2008.

---

342

344

350

Noah Matthew Geary, Esq., for Roland William Steele.

John C. Pettit, Esq., Amy Zapp, Esq., Washington County Attorneys Office, for Commonwealth of Pennsylvania.

BEFORE: CASTILLE, C.J., and SAYLOR, EAKIN, BAER, TODD, McCAFFERY and GREENSPAN, JJ.

## OPINION

Justice BAER.[1]

Following a jury trial between January 10 and January 22, 1986, Appellant Roland William Steele was convicted of three counts of first-degree murder, two counts of robbery, and two counts of theft by unlawful taking. The same jury fixed the punishment at three separate death sentences for the first-degree murder convictions. On direct appeal, this Court affirmed the convictions and death sentences. *See Commonwealth v. Steele*, 522 Pa. 61, 559 A.2d 904 (1989). Appellant now appeals from the denial of claims raised in his PCRA petition. For the reasons contained herein, we affirm the order of the PCRA court denying Appellant relief.

The facts of this case, while long and complex, are relevant to the disposition of this case. The bodies of Lucille Horner, age 88, Minnie Warrick, age 86, and Sarah Kuntz, age 85, were found on the morning of June 22, 1985, in a secluded, wooded area off a dirt road in Cecil Township. Pursuant to the subsequent autopsy, Dr. Earnest L. Abernathy of Washington County determined that the victims were killed the previous day between 12:30 p.m. and 9:30 p.m. At Appellant's trial, Dr. Abernathy testified that Ms. Horner's injuries included significant bruising on her chin, chest, and back, damage to her heart, numerous fractures of her ribs, a fracture of her backbone, damage to her liver, and a torn larynx. Dr. Abernathy concluded that the cause of death was traumatic

1. This matter was reassigned to this Justice.

rupture of the heart. The autopsy of Ms. Kuntz revealed similar injuries, including bruises on her face, chest, and legs, lacerations to the scalp, fractured ribs, and damage to her heart and liver. Dr. Abernathy concluded that the cause of death was asphyxia due to a fracture of the larynx. With regard to Ms. Warrick, Dr. Abernathy testified that she also sustained bruising to the face and chest, fractured ribs, and heart damage, as well as a partially collapsed lung and blow-out of the stomach wall. The cause of death for Ms. Warrick was traumatic rupture of the heart, with numerous companion injuries. Dr. Abernathy testified that the pattern of bruising was similar in all three cases, caused by substantial blunt force blows, which, in his opinion, were most likely delivered by human hands.

During the investigation, the police learned that the three victims had attended a luncheon together on Friday, June 21 at 1:00 p.m. at the Millcraft Shopping Center, and that they had driven to this event together in Ms. Horner's car, a beige four-door Dodge Dart. Mildred Stitler testified that on June 21, 1985, she observed, from her apartment window overlooking the shopping center parking lot, an elderly woman standing with a bald, well-dressed, African–American man, identified as Appellant, next to a car. She noticed Appellant pointing to the rear of the car as if something was wrong with the tire. The two got into the car, with Appellant in the driver's seat, and drove away, apparently to pick up the other two victims who were waiting for the car at another location in the shopping center. Kimberly Oyler testified that on June 21, 1985, she was at the Millcraft Shopping Center at approximately 2:15, and, as she was parking her car, she observed Appellant holding open the rear door of a vehicle (later determined to be Ms. Horner's car) as two elderly women entered the rear seat. A third witness, Harry Crothers, testified that he was personally acquainted with Ms. Horner, who was his friend's mother-in-law. Mr. Crothers owned a shop across the street from the shopping center, and observed Ms. Horner in the passenger seat of her car, with two elderly

women in the back seat and Appellant driving, as the vehicle left the shopping center at about 2:30 p.m.

Joseph Klements, owner of a gas station and convenience store 1.5 miles, or a four minute drive, from where the bodies were found, testified that he observed a cream colored Dodge or Plymouth four-door sedan drive into his station between 3:00 and 3:30 p.m. on the day of the murders, June 21, 1985. Appellant got out of the car, and there were no other occupants in the vehicle. Witnesses inside the store, who identified Appellant from a photographic array, stated that he purchased some soda, and handed a child a gold-chain necklace. He left the store and drove away, heading north. Shortly thereafter, Mr. Klements observed Appellant driving the same vehicle heading south past the station. Appellant appeared a third time, between 4:00 and 4:30, when he coasted into the station with the motor off. An employee assisted Appellant in restarting the car, and he drove away. Mr. Klements identified Ms. Horner's vehicle as the car he had seen Appellant driving during his multiple stops at the service station throughout the day of the murders. Other witnesses identified the necklace Appellant gave to the child as belonging to Ms. Warrick.

Evidence was also introduced at trial concerning a burglary that occurred that day at the home of Delha Woznicak, which was located three-tenths of a mile, about a thirty second drive, from the Klements service station. Ms. Woznicak testified that her residence was broken into between 3:25 and 4:50 p.m. on June 21, 1985. She identified evidence introduced at trial as items stolen from her home, and further identified the bottom portion of a dress that she had found in her abode while cleaning up after the burglary, which Ms. Warrick's relative identified as the dress Ms. Warrick wore to the luncheon.[2]

At this time, Appellant resided with his girlfriend, Joan Whitlock, approximately thirty minutes from the Klements service station. Ms. Whitlock's neighbors testified that on the

2. In fact, the top portion of Ms. Warrick's dress was on her body when it was discovered June 22, 1985.

evening of June 21, 1985, they observed Appellant driving a beige four-door sedan, and saw him unloading from this car items later identified as belonging to the Woznicaks. When Appellant was arrested on June 23, 1985, numerous items identified as the Woznicaks' were discovered in his possession.

A white vinyl purse, identified as the property of one of the victims and containing credit cards in the name of two victims, Ms. Horner and Ms. Kuntz, was found on the grounds outside a housing project in McKees Rocks, approximately one mile from Ms. Whitlocks' residence. Ms. Whitlock's brother resided there, and testified that Appellant visited him the night of June 21, 1985. Alfred Adams testified for the Commonwealth that he grew up with Appellant, and that at one time Appellant had lived approximately 600–800 yards from where the victims' bodies were found. The Commonwealth also established that Appellant had been an instructor in martial arts, and held a black belt in karate. Further, the Commonwealth submitted expert testimony from FBI Special Agent Andrew Podolak, who testified that he examined samples of a hair found on Appellant's clothing, and determined that the hair had characteristics similar to that of Ms. Warrick's, and in his expert opinion, the hair was Ms. Warrick's.

The Commonwealth's last witness at trial was Sarah Hair. Ms. Hair testified that on June 18, 1985, three days before the murders, at approximately 6:15 p.m., she was sitting in her car in the parking lot of Chartiers Valley Shopping Center in Bridgeville when she was approached by a bald African–American man whom she identified as Appellant. Appellant told her that her car had a flat tire. Ms. Hair inspected the tire, but could see nothing out of the ordinary. Appellant was persistent, she stated, saying that he observed someone "fooling" with the tire. Appellant attempted to extract a nail from the tire, and after several minutes offered to drive Ms. Hair to a service station to have the tire repaired. She refused his offer, and attempted to drive away. Appellant, however, blocked her from driving away, then bent down and stood up holding a pair of scissors, claiming to have found them under the tire. Ms. Hair took the scissors, saying she would take

them to the police. Appellant took them back, and stated that he would take them there. As a result of this incident, Ms. Hair made a complaint with the Collier Township Police.

Appellant testified on his own behalf, denying his involvement in the homicides and the Woznicak burglary. He admitted that he was in the area on June 21, 1985, to see an attorney, but that he left, returning by car to Pittsburgh at about 12:45 or 1:00 p.m. with a man known to him only as "P.I." Appellant further testified that he came to be in possession of the Woznicak's belongings after meeting with P.I. on the night of the 21st in the Hill District of Pittsburgh. Other defense evidence included defense experts who offered their opinions that the blows sustained by the victims were not the result of a karate-style attack, karate blows, or a human hand. Finally, although other witnesses testified as to Appellant's whereabouts on June 21, 1985, none were able to account for the time between 12:00 noon and 7:00 p.m.[3]

Following the guilt phase, trial counsel presented the testimony of two individuals at the penalty phase in support of the "catch-all mitigator:[4]" Lamont Stephens[5] and Appellant's mother. Mr. Stephens testified that when Appellant was seventeen, he saved Mr. Stephens, then two years old, from being killed by a train. For this heroic act, Appellant received the Carnegie Hero Award. Appellant's mother likewise testified about this award and stated that her son had always been nonviolent.

3. Dr. Richard Berkey conducted a psychiatric evaluation of Appellant in connection with the guilt phase. Dr. Berkey concluded that Appellant evidenced some grandiose and paranoid tendencies; his thinking was highly organized; there was no indication of bizarre of delusional ideation; and Appellant did not seem psychotic or incompetent. Trial counsel attempted to introduce his testimony during the guilt phase to demonstrate that Appellant was not a violent person. The trial court did not permit this testimony, and this Court affirmed. *Steele*, 559 A.2d at 911.

4. *See* 42 Pa.C.S. § 9711(e)(8).

5. There is some confusion in the record regarding the name of this individual: he is referred to as Lamont Stephens, Lamont Stevens, and Lamont Anderson. Throughout this opinion we refer to him as Mr. Lamont Stephens, as that was the name published in the Carnegie Hero Fund 1964 Annual Report.

Following the conclusion of the penalty phase, the jury found three aggravating circumstances with respect to Ms. Horner and Ms. Warrick, *see* 42 Pa.C.S. § 9711(d)(6), (d)(8), and (d)(10), and, with respect to Ms. Kuntz, the jury found two aggravating circumstances, *see* 42 Pa.C.S. § 9711(d)(8) and (d)(10).[6] In each instance the jury found that the aggravating circumstances outweighed the catch-all mitigator apparently accepted by the jury. *See* 42 Pa.C.S. § 9711(e)(8) ("Any other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense").

After Appellant's convictions and death sentence, trial counsel filed post-trial motions, which were denied on March 25, 1988. This Court affirmed Appellant's sentence on June 5, 1989.[7] During years of legal wrangling before the PCRA court, Appellant filed a *pro se* PCRA petition in 1996, and a counseled amended PCRA petition in January of 2000, raising eighteen issues, including allegations of ineffective assistance of counsel. The PCRA court held a limited evidentiary hearing, permitting Appellant to present the testimony of two witnesses: trial counsel Attorney Tershel and his investigator Michael Reid. Following the hearing, the PCRA court denied all of Appellant's claims. Appellant thereafter appealed directly to this Court.[8]

6. 42 Pa.C.S. § 9711(d) provides, in relevant part, as follows:

 (6) The defendant committed a killing while in the perpetration of a felony.

 * * *

 (8) The offense was committed by means of torture.

 * * *

 (10) The defendant has been convicted of another Federal or State offense, committed either before or at the time of the offense at issue, for which a sentence of life imprisonment or death was imposable or the defendant was undergoing a sentence of life imprisonment for any reason at the time of the commission of the offense.

7. Appellant was represented at trial, post-sentence motions, and on appeal by the same counsel: public defenders John Liekar, Esq., and his first assistant, Paul A. Tershel, Esq. Mr. Liekar died before the initiation of the PCRA litigation.

8. This Court has jurisdiction over Appellant's petition because we directly review the denial of post conviction relief in death penalty cases pursuant to 42 Pa.C.S. § 9546(d).

■ On appeal from the denial of PCRA relief, our standard of review calls for us to determine whether the ruling of the PCRA court is supported by the record and free of legal error. *Commonwealth v. Washington*, 592 Pa. 698, 927 A.2d 586, 593–94 (2007); *Commonwealth v. Breakiron*, 566 Pa. 323, 781 A.2d 94 (2001); *Commonwealth v. Strong*, 563 Pa. 455, 761 A.2d 1167, 1170 n. 3 (2000). In order to be eligible for PCRA relief, Appellant must prove by a preponderance of the evidence that his conviction or sentence resulted from one or more of the enumerated circumstances found at 42 Pa.C.S. § 9543(a)(2).

■ Further, Appellant must demonstrate that the issues raised in his PCRA petition have not been previously litigated or waived, and that "the failure to litigate the issue prior to or during trial or on direct appeal could not have been the result of any rational strategic or tactical decision by counsel." *Washington*, 927 A.2d at 593 (citing 42 Pa.C.S. §§ 9543(a)(3), (4)). An issue has been previously litigated if "the highest appellate court in which the petitioner was entitled to review as a matter of right has ruled on the merits of the issue." *Id.* (citing 42 Pa.C.S. § 9544(a)(2)); *Commonwealth v. Crawley*, 541 Pa. 408, 663 A.2d 676, 678 (1995). A PCRA claim is waived "if the petitioner could have raised it but failed to do so before trial, at trial, during unitary review, on appeal or in a prior state post-conviction proceeding." 42 Pa.C.S. § 9544(b). Further, we no longer apply the relaxed waiver doctrine in capital PCRA appeals. *Commonwealth v. Albrecht*, 554 Pa. 31, 720 A.2d 693, 700 (1998).[9]

9. We note that the fact that Appellant's first PCRA petition was filed before our decision in *Albrecht* was decided is irrelevant. The *Albrecht* rule was merely a clarification of this Court's practice of relaxing the waiver rules, and not a rule of constitutional dimension. *Commonwealth v. Bracey*, 568 Pa. 264, 795 A.2d 935, 941 (2001). Indeed, we have consistently applied the strict waiver rule in PCRA capital appeals where the petition was filed before *Albrecht*. *See Commonwealth v. Pursell*, 555 Pa. 233, 724 A.2d 293, 306 (1999) (applying *Albrecht* to 1982 conviction, where PCRA petition was filed in 1991); *Commonwealth v. Laird*, 555 Pa. 629, 726 A.2d 346, 354 (1999) (applying *Albrecht* to 1988 conviction, where PCRA petition was filed in 1993); *Commonwealth v. Wallace*, 555 Pa. 397, 724 A.2d 916, 920–21 (1999)

■ Appellant now raises seventeen issues of alleged error, many of which involve allegations of ineffective assistance of counsel. In Pennsylvania, counsel is presumed effective, and a defendant bears the burden of proving otherwise. *Commonwealth v. Hall*, 549 Pa. 269, 701 A.2d 190, 200–201 (1997). In order to be entitled to relief on a claim of ineffective assistance of counsel, the PCRA petitioner must plead and prove by a preponderance of the evidence that (1) the underlying claim has arguable merit; (2) counsel whose effectiveness is at issue did not have a reasonable basis for his action or inaction; and (3) the PCRA petitioner suffered prejudice as a result of counsel's action or inaction. *Commonwealth v. McGill*, 574 Pa. 574, 832 A.2d 1014, 1020 (2003); *Commonwealth v. (Michael) Pierce*, 567 Pa. 186, 786 A.2d 203, 213 (2001); *Commonwealth v. (Charles) Pierce*, 515 Pa. 153, 527 A.2d 973 (1987); *see also Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) (explaining that, to establish an ineffective assistance claim, a defendant must show that counsel's performance was deficient and that such deficiencies prejudiced the defense). When determining whether counsel's actions or omissions were reasonable, "we do not question whether there were other more logical courses of actions which counsel could have pursued: rather, we must examine whether counsel's decisions had *any* reasonable basis." *Commonwealth v. Rios*, 591 Pa. 583, 920 A.2d 790, 799 (2007) (citation omitted) (emphasis added). Further, to establish prejudice, a petitioner must demonstrate that "but for the act or omission in question, the outcome of the proceedings would have been different." *Id.* at 799 (citing *Commonwealth v. Rollins*, 558 Pa. 532, 738 A.2d 435, 441 (1999)). Where it is clear that a petitioner has failed to meet any of the three, distinct prongs of the *Pierce* test, the claim may be disposed of on that basis alone, without a determination of whether the other two prongs have been met. *Commonwealth v. Basemore*, 560 Pa. 258, 744 A.2d 717, 738 n. 23 (2000).

(applying *Albrecht* to 1985 conviction, where PCRA petition was filed in 1995).

In accord with these well-established criteria for review, a petitioner must set forth and individually discuss substantively each prong of the *Pierce* test. *Commonwealth v. James Jones*, 583 Pa. 130, 876 A.2d 380, 386 (2005); *Commonwealth v. (Aaron) Jones*, 571 Pa. 112, 811 A.2d 994, 1003 (2002); *Commonwealth v. Wharton*, 571 Pa. 85, 811 A.2d 978, 988 (2002) ("Claims of ineffective assistance of counsel are not self-proving...."); *(Michael) Pierce*, 786 A.2d at 221 (noting that an appellant cannot prevail on claim of ineffective assistance of counsel when claim is not developed); *(Charles) Pierce*, 515 Pa. 153, 527 A.2d 973. In multiple claims in this case, Appellant only addresses the first prong, arguing that the underlying claim has arguable merit, followed by a bald assertion of the lack of a reasonable basis and the fact of prejudice.[10] Such undeveloped claims, based on boilerplate allegations, cannot satisfy Appellant's burden of establishing ineffectiveness. *See Jones*, 876 A.2d at 386; *Commonwealth v. Bracey*, 568 Pa. 264, 795 A.2d 935, 940 n. 4 (2001) ("[s]uch an undeveloped argument, which fails to meaningfully discuss and apply the standard governing the review of ineffectiveness claims, simply does not satisfy Appellant's burden of establishing that he is entitled to any relief."). Thus, where Appellant has failed to set forth all three prongs of the ineffectiveness test and meaningfully discuss them, he is not entitled to relief, and we are constrained to find such claims waived for lack of development. As referenced above and discussed *infra*, many of the claims asserted by Appellant fail on this basis.[11]

10. Although the merits analysis encompasses the argument that would be made if this were a direct appeal, the petitioner must nevertheless set forth herein the two other prongs of ineffectiveness, because Sixth Amendment ineffectiveness claims are distinct from merits review. *Commonwealth v. Collins*, 585 Pa. 45, 888 A.2d 564 (2005).

11. Appellant's point, as well as that of Justice Saylor, that at the time Appellant filed his brief in 2003 this Court's recent opinions regarding pleading and proof in capital PCRA cases were "confusing, inconsistent and constantly shifting," brief for Appellant at 7–8, has merit given the difficulties we have acknowledged are present in capital PCRA litigation. *See Commonwealth v. Gibson*, 951 A.2d 1110, 1121 (Pa.2008). At the time Appellant filed his brief, however, claims of ineffectiveness were not self-proving, and undeveloped claims of ineffectiveness were insufficient to prove an entitlement to relief. *See (Aaron) Jones*, 811

We will not address the issues in the order presented by Appellant. Rather, we will begin with the issues implicating the guilt phase of trial.

## Guilt Phase

### I. Trial Court Error Regarding the Commonwealth's Expert

■ Appellant's first issue is a claim of trial court error regarding the admissibility of the testimony of FBI Special Agent Podolak, who opined that hair samples found on Appellant's clothing came from one of the victims. Appellant asserts this testimony was false, misleading, and without scientific basis, and therefore inadmissible. The PCRA court found that the challenged testimony of Mr. Podolak was, in fact, admissible, and that even if it was not, its admission was harmless error.

The FBI forensic examination conducted by Mr. Podolak pre-trial resulted in a report indicating that the hair found on Appellant's clothes shared characteristics with Ms. Warrick's hair, and was "consistent with having originated from [Ms. Warrick]." Brief for Appellant at 42. The report contained the qualification that "hair comparisons do not constitute a

A.2d at 1003. *See also Commonwealth v. Bond*, 572 Pa. 588, 819 A.2d 33, 40 (2002).

In an effort to define his burden to prove trial counsel's ineffectiveness, Appellant sets forth the three prongs of ineffectiveness outlined above at the beginning of his brief. Brief for Appellant at 10. Defining his burden at the outset of his brief and adequately meeting the burden of developing his substantive claims, however, are not the same thing. When it comes to demonstrating trial counsel's ineffectiveness for acting or failing to act in specific instances, Appellant has, as noted, opted for assertions of ineffectiveness rather than attempting to demonstrate, for example, how or why the outcome of the trial would have been different but for the act or omission in question. *See Rios*, 920 A.2d at 799. Counsel is presumed effective. Therefore, where Appellant failed to do more than assert that his claim has arguable merit, counsel lacked a reasonable basis for their acts or omissions, and he was prejudiced by counsel's conduct, the presumption that counsel were effective prevails. Appellant does not meet his burden before this Court with regard to presenting claims of ineffectiveness by simply citing to *Strickland*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674, emphasizing his perceived difficulty with this Court's jurisprudence, and asserting that he meets the three prongs of counsel ineffectiveness.

basis for absolute personal identification." *Id.* Trial counsel filed a motion *in limine* to exclude Mr. Podolak's testimony on the theory that the opinion described in the report violated the rule of *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923), adopted by this Court in *Commonwealth v. Topa*, 471 Pa. 223, 369 A.2d 1277 (1977) (requiring scientific evidence to be generally accepted in the scientific community). In response to that motion, the prosecutor indicated that, consistent with this report, Mr. Podolak would testify concerning findings that the hair had the same characteristics as that of Ms. Warrick. The trial court denied the motion *in limine*. At trial, Mr. Podolak testified that it was his opinion that the hairs found on Appellant's clothes "came from" Ms. Warrick. Trial counsel fully cross-examined Mr. Podolak on the contents and accuracy of his findings and conclusions, and Mr. Podolak conceded that his findings were not conclusive. The defense called Dr. Cyril H. Wecht, a practicing physician and pathologist, to testify as to the origin of the subject hair sample, which contradicted Mr. Podolak's testimony.

Appellant argues that his rights to a fair trial and due process were violated when the trial court permitted the Commonwealth to introduce Mr. Podolak's expert testimony regarding the hair samples found on Appellant's clothing. Specifically, Appellant argues that there is no scientific basis for any hair examiner to claim the ability to determine that a hair sample came from a specific person. Appellant now seeks a PCRA hearing to demonstrate that the Commonwealth's expert's testimony was false and misleading.

This issue is waived. Appellant argued before the trial court that it had erred in admitting the opinion evidence of Mr. Podolak regarding the hair samples found on Appellant's clothing. *See Commonwealth v. Steele*, Nos. 686–688 of 1985, slip op. at 18–20 (C.P. Washington County, March 3, 1988) (1988 Trial Ct. Op.). On direct appeal to this Court, however, Appellant did not raise the issue. An issue is waived if Appellant "*could have raised it* but failed to do so before trial, at trial, during unitary review, *on appeal* or in a prior state postconviction proceeding." 42 Pa.C.S. § 9544(b) (emphasis

added). Here, Appellant plainly could have raised the issue on direct appeal to this Court, but failed to do so. Thus, the claim is waived.[12]

■ To the extent Appellant alleges ineffective assistance of counsel for failing to pursue this claim of trial court error on direct appeal, Appellant has failed to address and develop meaningfully the three prongs of the ineffectiveness test. *See Wharton,* 811 A.2d at 988; *Bracey,* 795 A.2d at 940 n. 4; *(Michael) Pierce,* 786 A.2d at 221. Further, as discussed in connection with the second issue, below, regarding trial counsel's cross-examination of Agent Podolak, we do not agree with Appellant that if counsel had raised this claim on direct appeal, the outcome of that appeal would have been different given the overwhelming nature of the evidence against Appellant.

## II. Ineffectiveness Stemming from the Hair Analysis

■ This issue contains several subparts. First, Appellant argues that the Commonwealth violated Pa.R.Crim.P. 305,[13] which requires it, when requested, to disclose expert reports and imposes a continuing duty on both parties to disclose additional evidence to the other party. This subpart arises from Agent Podolak's testimony. As described above, Mr. Podolak stated in the report that hair analysis does not provide an absolute basis for identification. Counsel filed a motion *in limine* to exclude Mr. Podolak's testimony. The trial court denied the motion, and Mr. Podolak testified that he could make, and did make, a positive identification of the source of the hair found on Appellant's clothes. According to Appellant, the Commonwealth never disclosed that the agent

12. Appellant alleges that trial counsel was ineffective for failing to secure an expert to refute this allegedly false testimony. This assertion, contained in a single sentence, falls far short of this Court's requirements for developing ineffectiveness claims. Appellant makes no argument regarding any of the three prongs of the ineffective test, and has not, therefore, carried his burden of establishing that he is entitled to post-conviction relief. *See Jones, supra.* Further, counsel did, in fact, obtain Dr. Wecht to refute the Commonwealth's expert.

13. This rule has since been renumbered to 573.

would render this opinion, before or during trial. As such, Appellant contends that the Commonwealth deliberately violated the rules of discovery. Appellant argues that this discovery violation rendered defense counsel ineffective at the motion *in limine* proceeding. Specifically, Appellant argues that had counsel known of the actual content of Mr. Podolak's proposed testimony, or if the Commonwealth had been forthright with the court during the litigation on the motion *in limine,* counsel would have persuaded the trial court to exclude this evidence as violating the *Frye/Topa* requirement of general acceptance in the scientific community.

■ Appellant woefully fails to develop any argument regarding the three separate prongs of the ineffective test. His entire argument seems to be directed towards the arguable merit prong. He makes no mention whatsoever of whether counsel had a reasonable basis, or how counsel's failures prejudiced him. Appellant fails to meet his burden, and his claim must fail. *See Jones, supra.* Further, we fail to see how counsel can be considered ineffective at the motion *in limine* hearing. Based on the information contained in the report, trial counsel argued that Mr. Podolak's testimony should be excluded because the opinion described in the report was not generally accepted in the scientific community. It is not apparent what more counsel could have done, and the fact that the agent subsequently testified conclusively does not render counsel's performance ineffective at the motion *in limine* hearing.

■ Second, Appellant argues that trial counsel was ineffective for failing to object to Agent Podolak's trial testimony positively connecting the hair found on Appellant's clothes to Ms. Warrick. Although Appellant argues the arguable merit portion of the ineffectiveness test, he completely ignores the reasonable basis and prejudice prong. As this Court noted in *Bracey,* "[s]uch an undeveloped argument, which fails to meaningfully discuss and apply the standard governing the review of ineffectiveness claims, simply does not satisfy Appel-

lant's burden of establishing that he is entitled to any relief."
*Bracey*, 795 A.2d at 940 n. 4.

Third, Appellant argues that counsel was ineffective
for failing adequately to cross-examine, impeach, and rebut
Mr. Podolak's testimony. Appellant argues that, had counsel
adequately prepared, he could have impeached Agent Podo-
lak's testimony by the use of "standard treatises" and in
numerous other respects, including the following eight points:
(1) the uniqueness of cuticle cells and cortical fusi in hair; (2)
the subjective nature of hair analysis; (3) the existence of
recorded examples of hairs from different individuals that
match hairs from other individuals based on all microscopic
characteristics; (4) the allegedly exaggerated amount of hairs
claimed to be examined by Agent Podolak in relation to the
amount of time necessary to adequately examine a single hair;
(5) the 67% error rate in hair comparison analysis; (6) the
speculative nature of the prosecution's "secondary transfer"
theory regarding the location where the hairs were found;[14]
(7) the accuracy and propriety of Agent Podolak's method of
comparing questioned samples to his own hair; and (8) the
alleged false and misleading statements regarding Agent Po-
dolak's ability to render an opinion on the source of the hair.
*See* Brief for Appellant, at 56–57.

Appellant contends that counsel was without a reasonable
basis for not adequately preparing and cross-examining Agent
Podolak on the above points. He also contends that he was
prejudiced by trial counsel's failures because the hair evidence
was the only direct evidence linking him to the crime. As
such, adequate preparation and cross-examination, according
to Appellant, would have likely led to a different result. We
disagree.

14. The examined hair was found on clothing that was different from
what the prosecution proved Appellant was wearing on the day in
question. The prosecution, and Agent Podolak, surmised that the hair
was deposited on the clothing Appellant wore the day of the murders
and was later transferred to the clothing where it was found by virtue of
being in the same closet or in some other similar fashion.

Appellant cannot demonstrate that he was prejudiced by trial counsel's actions. Even if we assume that trial counsel's preparation and cross-examination were inadequate, which we need not take a position on here, we cannot agree with Appellant that the outcome of the proceeding would likely have been different. *See Rios, supra.* Even if the jury disregarded the hair evidence, the evidence at trial overwhelmingly demonstrated Appellant's guilt. Three different eyewitnesses saw Appellant with the victims at, or near, the Millcraft Shopping Center. The first witness observed Appellant approach one of the victims and point to the car's tire. The same witness watched as Appellant got into the drivers' seat of the car. The second witness saw Appellant holding the door open for the other two victims as they entered the vehicle. A third witness identified Appellant driving the car around the time in question while his friend's mother-in-law, Ms. Horner, was in the passenger seat. Appellant was then seen driving the victim's car later that day at the Klements Service Station.

Testimony was also introduced regarding a burglary that occurred shortly after the murders at the home of Ms. Woznicak, which was a short distance from the Klements Service Station. Appellant was later observed by three witnesses unloading the stolen items from Ms. Warrick's vehicle into his girlfriend's home. Ms. Woznicak found a strip of cloth that was later determined to be from the dress worn by Ms. Warrick the day she was murdered. Moreover, the bodies of the victims were found approximately 600–800 yards from Appellant's childhood home. The Commonwealth introduced testimony that Appellant was a black-belt in karate, which was important because the coroner found that the victims were likely killed by blunt trauma by a human hand. Finally, Ms. Hair testified that just three days before the murder, Appellant tried to gain access to her and her vehicle by fabricating a problem with the vehicle's tire, going so far as to feign seeing a nail in the tire and a pair of scissors under the tire. All of this evidence is sufficient to establish Appellant's guilt, even if the jury disregarded the hair comparison evidence. Thus,

Appellant's claim must fail as he cannot demonstrate prejudice.

██ Fourth, Appellant argues that counsel was ineffective for failing to request, in a timely manner, an expert examination of a hair and a cigarette found in the victim's car, and that the court abused its discretion by refusing to order the testing that was requested mid-trial.[15] Appellant, noting his constitutional right to a fair opportunity to present his defense, relies on *Ake v. Oklahoma,* 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985) and *Commonwealth v. Carter,* 537 Pa. 233, 643 A.2d 61, 73 (1994) for the position that an indigent criminal defendant is entitled to the assistance of expert opinions to prepare an adequate defense. At trial, the Commonwealth introduced evidence that an African–American hair was found in the vehicle. Trial counsel did not request that the hair be compared to Appellant or anyone else until midway through the trial. Accordingly, Appellant asserts that trial counsel was ineffective for not timely preparing the case and waiting until mid-trial to request expert assistance to test the hair.

Appellant fails to address the reasonable basis and prejudice prongs of the ineffectiveness test. Rather, he advances only boilerplate allegations of ineffective assistance of counsel. As such, Appellant has not carried his burden of proving he is entitled to relief. *See Jones, supra.*[16]

**15.** We rejected the claim that the trial court erred in refusing this request on direct appeal. This aspect of the argument, therefore, is previously litigated. *Steele,* 559 A.2d at 911.

**16.** Justice Saylor cites as an example of our allegedly "overly stringent" treatment of Appellant's arguments of ineffectiveness our consideration of the subparts of Appellant's ineffectiveness claim stemming from the hair analysis, which is Claim II. Specifically, in three of the four subparts to this claim, Appellant has failed to argue that he was prejudiced by counsel's conduct. Justice Saylor notes that in connection with Claim I, regarding Appellant's argument of trial court error in admitting the testimony of the Commonwealth's expert, Appellant characterized the expert's testimony as prejudicial, and expresses the view that this assertion in connection with Claim I is equally applicable to Claim II.

With all due respect, characterizing the damaging nature of the expert's testimony, which Appellant contends in Claim I that the trial court erred in admitting, does not obviate Appellant's burden to demon-

### III. Admissibility of Hair Analysis Evidence

In another issue, Appellant argues that admission of the hair comparison evidence violated his constitutional rights to due process pursuant to this Court's decision in *Topa,* 471 Pa. 223, 369 A.2d 1277.[17] In *Topa,* this Court reversed a murder conviction that was based on testimony of an expert in spectography, who identified the appellant's voice during a confession on a recorded telephone call. This Court rejected the use of spectography as its validity was not generally accepted by those in the same scientific field. *Id.* at 1281. Appellant contends that hair comparison evidence is similarly unaccepted, and should not have been permitted at trial.

This issue, to the extent it involves a constitutional question, is waived.[18] 42 Pa.C.S. § 9544(b). As Appellant notes, nothing prevented counsel from raising this issue on direct appeal. Appellant seeks to resurrect the claim by making a blanket claim of ineffectiveness for failing to raise the issue on appeal. Again, he does not meaningfully address the three prongs of the *Pierce* test with minimally adequate detail. Therefore, this claim too must fail. *See Jones, supra.* Further, as we noted in disposing of Appellant's claim that trial counsel was ineffective for failing to cross-examine Mr. Podolak adequately, the evidence against Appellant was over-

strate, in the subparts of his next substantive claim, that the outcome of the trial would have been different but for counsel's omissions: counsel's failure to anticipate that the actual testimony presented by the Commonwealth's expert differed from the purported testimony offered in the expert report; counsel's failure to object to the agent's positive identification of the hair found on Appellant's clothes; or counsel's failure to request an expert examination of another hair and a cigarette found in the victim's car.

17. This issue is very similar to the first issue we addressed. In the first issue, Appellant argued that Mr. Podolak's testimony was misleading, whereas in this issue, Appellant argues that hair comparison evidence generally is inadmissible because it does not have general acceptance in the scientific community, as required by *Topa.*

18. To the extent that Appellant argues trial counsel should have moved to exclude the Commonwealth's hair comparison testimony, as we have already noted, trial counsel did, in fact, file a motion *in limine* to exclude this evidence.

whelming, and we cannot conclude that had counsel raised this issue on appeal, the conviction would have been reversed.

## IV. Ineffectiveness Relating to Voir Dire

Appellant next claims that the jury selection process was defective in violation of his rights pursuant to the 5th, 6th, 8th and 14th Amendments to the United States Constitution and Article I, Sections 9 and 13 of the Pennsylvania Constitution. This argument has several subparts.

First, Appellant argues that trial counsel was ineffective for failing to ask specific questions regarding racial bias and attitudes towards race because this case involved an African–American man charged with murdering three white women. The trial court granted trial counsel permission to ask the following three questions during *voir dire:* (1) "Do you feel that black people are more likely to commit a crime than white people?;" (2) "Do you have any prejudices towards black people?;" and (3) "Would you give more credence to the testimony of a white person over that of a black person simply because he was a white person?" Brief for Appellant at 64. Appellant alleges that during the *voir dire* process, trial counsel asked only the first question, rather than all three. This, he claims, rendered counsel ineffective.

Again, in order to be entitled to relief, Appellant must plead and prove by a preponderance of the evidence that (1) the underlying claim has arguable merit; (2) counsel whose effectiveness is at issue did not have a reasonable basis for his action or inaction; and (3) the PCRA petitioner suffered prejudice as a result of counsel's action or inaction. *Pierce,* 786 A.2d at 213.

Assuming *arguendo* that this claim has arguable merit, we first turn to whether counsel had a reasonable basis for asking only one of the three permitted questions. As the PCRA court noted, an effective attorney may refrain from asking a prospective juror repeatedly about racial bias if he believes doing so may anger, embarrass, or annoy a potential juror that the attorney finds acceptable. PCRA Court Op. at

19. Therefore, counsel may have had a legitimate reason not to ask all three questions concerning racial prejudice to each prospective juror. *See Commonwealth v. Richardson*, 504 Pa. 358, 473 A.2d 1361, 1364 (1984) (noting that there are valid reasons not to ask questions concerning racial issues even in a case where the victim is white and the defendant is black); *Commonwealth v. Henry*, 550 Pa. 346, 706 A.2d 313 (1997) (finding counsel was not ineffective for failing to ask racial prejudice questions in a case involving a black defendant and a white victim).

Moreover, the mere fact that counsel was permitted to ask three questions but only asked one does not alone demonstrate prejudice. Having gotten an answer regarding whether the prospective juror felt that black people were more likely to commit a crime than white people, it is difficult to see how Appellant could persuasively demonstrate prejudice because counsel did not also ask that juror whether he or she had racial prejudices against black people or would credit a white person's testimony over that of a black person.

Second, Appellant argues trial counsel was ineffective for failing to rehabilitate jurors who showed they were hesitant to impose the death penalty when the prosecutor was "death qualifying" them. Appellant asserts that the prosecutor challenged for cause eleven jurors who initially stated some form of opposition to the death penalty, and trial counsel failed to object or attempt to elicit more detailed information about whether the particular jurors were so predisposed that their personal beliefs would substantially impair their ability to judge the sentencing proceeding fairly. *See Witherspoon v. Illinois*, 391 U.S. 510, 522, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968) (holding that potential jurors may not be excluded merely because they voice general moral or philosophical reservations about the death penalty).

The decision to disqualify a juror is within the discretion of the trial court, and will only be reversed for an abuse of discretion. *Commonwealth v. Carson*, 590 Pa. 501, 913 A.2d 220, 262 (2006); *Commonwealth v. Wilson*, 543 Pa.

429, 672 A.2d 293, 299 (1996). A potential juror may be excluded if he holds views on capital punishment that prevents or substantially impairs that person from adhering to the trial court's instructions on the law. *Carson*, 913 A.2d at 262; *Commonwealth v. Lark*, 548 Pa. 441, 698 A.2d 43, 48 (1997). "A juror's bias need not be proven with unmistakable clarity." *Commonwealth v. Morales*, 549 Pa. 400, 701 A.2d 516, 525 (1997).

■ Appellant makes no argument whatsoever regarding the prejudice prong, nor does he argue that he is not required to argue prejudice. Therefore, Appellant is not entitled to relief because of his failure to meaningfully address the necessary prongs of ineffectiveness. *See Jones, supra, Bracey, supra.* Further, we have held that a trial court is within its discretion to exclude jurors who expressed reservations about imposing the death penalty, and that trial counsel has no constitutional obligation to attempt to change the jurors' views. *See Carson*, 913 A.2d at 262.

■ Finally, Appellant asserts that the empaneled jurors were not asked if they could impose a life sentence, making it likely that at least one juror was empaneled who would automatically vote for the death penalty.[19] Prior to trial, counsel petitioned the trial court to include specific *voir dire* questions for venire, including two questions that the trial court rejected: (1) "If you found the defendant guilty of first degree murder, would you automatically vote for the death penalty?" and (2) "Do you feel that capital punishment is a deterrent to murder?" Brief for Appellant at 68. Appellant argues that during *voir dire*, trial counsel did not probe the juror's beliefs on the death penalty once the juror stated that he or she could impose that sentence.

19. "Life-qualification" is the process by which prospective jurors are excluded from the jury based on their fixed opinion that the death penalty must be imposed for a first-degree murder conviction. *Commonwealth v. Speight*, 578 Pa. 520, 854 A.2d 450, 459 (2004); *Commonwealth v. Boxley*, 575 Pa. 611, 838 A.2d 608, 613 n. 2 (2003) (citing *Commonwealth v. Keaton*, 556 Pa. 442, 729 A.2d 529, 542 n. 9 (1999)); *Commonwealth v. Bomar*, 573 Pa. 426, 826 A.2d 831, 846 (2003).

 Appellant relies on *Morgan v. Illinois,* 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992), where the United States Supreme Court held that during *voir dire* in a capital case, a trial court may not, without violating the Due Process Clause of the 14th Amendment, refuse questioning regarding whether a juror would automatically impose a death sentence following a first degree murder conviction:

> A juror who will automatically vote for the death penalty in every case will fail in good faith to consider the evidence of aggravating and mitigating circumstances as the instructions require him to do. Indeed, because such a juror has already formed an opinion on the merits, the presence or absence of either aggravating or mitigating circumstances is entirely irrelevant to such a juror.... *If even one such juror is empanelled and the death sentence is imposed, the State is disentitled to execute the sentence.*

*Id.* at 729, 112 S.Ct. 2222 (emphasis supplied by Appellant); Brief for Appellant at 67.

It appears that Appellant is arguing trial court error in denying counsel's requested questions, rather than trial counsel ineffectiveness. In *Commonwealth v. Blystone,* 555 Pa. 565, 725 A.2d 1197 (1999), the appellant argued, as Appellant does here, that he was deprived of his right to an impartial capital jury as a result of the trial court's refusal to allow trial counsel to life qualify potential jurors. We rejected this claim, and found that the appellant's reliance on *Morgan* was misplaced because *Morgan* was a new constitutional rule of criminal procedure for *voir dire* in capital cases, and therefore did not apply retroactively. *Id.* at 1203. We recognized that prior to *Morgan,* the United States Supreme Court "had not imposed a mandatory requirement that a defendant be afforded a life qualifying *voir dire* question upon request." *Id.* Nor did Pennsylvania have such a requirement. Therefore, we held that the appellant was not entitled to have his counsel life qualify the jury, according to the law at the time of trial. *Id.*

We reach the same conclusion here. Appellant was tried and convicted in 1988. This Court rejected his appeal in 1989. *Morgan* was decided in 1992. Thus, the law at the time of

Appellant's trial did not mandate that juries be questioned on life qualification, and the trial court did not err in rejecting counsel's questions. *See Carson,* 913 A.2d at 262.[20]

## V. Instructions Regarding Identification Testimony

Appellant next alleges that his rights pursuant to the 5th, 6th, 8th, and 14th Amendments to the United States Constitution and Article I, Section 9 of the Pennsylvania Constitution were violated by the trial court's failure properly to instruct the jury regarding identification testimony. As Appellant notes, identification was a crucial aspect of the case. Appellant asserts that the cross-racial nature of the identification testimony, combined with the racially charged atmosphere of the trial, required careful control of the jury by the court, and the trial court's failure to instruct the jury regarding the difficult nature of such identifications raised serious questions about the accuracy of the verdict.

This issue has two subparts. The first is in regard to Harry C. Crothers, who testified for the Commonwealth. Mr. Crothers gave a statement to police one week after the homicide indicating that he saw Ms. Horner's car on the day of the murders and could identify it, but was not in a position to see the occupants clearly, other than observing three elderly women and a bald black man driving. At trial, however, he testified that he saw Appellant driving the car. To counter the Commonwealth's identification witnesses, including Mr. Crothers, the defense presented the testimony of an expert in perception and memory, who testified regarding matters affecting the reliability of eyewitness identification, specifically cross-racial identifications. Further, the defense presented the testimony of three witnesses who observed a similar looking man, who was not Appellant, in the area around the time of the crimes. In light of this defense testimony, includ-

20. Appellant also asserts that the trial court erred in not ordering the production of the entire *voir dire* transcript for appellate purposes. *See* Brief for Appellant at 70–73. However, because we find that Appellant cannot carry his burden of demonstrating he is entitled to relief with regard to any of the claims he raises implicating the jury selection process, we need not address this issue.

ing the testimony of the defense expert, trial counsel requested an instruction with respect to Mr. Crothers, "in an effort to channel the jury in the direction of careful reasoned consideration and steer the jury away from conjecture." Brief for Appellant at 76. The requested instruction was taken from the standard jury instructions:

A victim or other witness can sometimes make a mistake when trying to identify the criminal. If certain factors are present, the accuracy of identification testimony is so doubtful that a jury must receive it with caution. Identification testimony must be received with caution (if the witness because of bad position, poor lighting or other reasons did not have a good opportunity to observe the criminal) (if the witness in his testimony is not positive as to identity) (if the witness' positive testimony is weakened [by qualifications, hedging or inconsistencies in the rest of his testimony] [by his not identifying the defendant, or identifying someone else, as the criminal (at a lineup) (when showing photographs) (_____) before the trial] ) (if, before the trial, the defendant's request for a (lineup) (_____) to test the ability of the witness to make an identification was denied and the witness subsequently made a less reliable identification) (if,_____).

Brief for Appellant at 76–77 (quoting Standard Jury Instructions, 4.07). The trial court rejected this request.

■■■ Appellant now argues that the trial court erred in denying the requested instruction, based on the Standard Jury Instructions, regarding how the jury should assess the credibility and weight of an identification witness. We find this claim to be waived. Appellant raised it before the trial court after his conviction and sentence. *See* PCRA Ct. Op. at 23 (citing 1988 Trial Ct. Op.). However, Appellant did not pursue the claim on direct appeal to this Court, although he could have. *See* 42 Pa.C.S. § 9544(b) (stating that a claim is waived if an appellant could have raised it but failed to do so on appeal). To the extent counsel was ineffective for failing to pursue this claim on appeal, Appellant fails to discuss and

apply the governing ineffectiveness standard. As such, his claim fails. *See Bracey, supra.*

Second, Appellant argues that although the defense presented testimony concerning the unreliability of cross-racial identification, counsel did not request and the trial court did not give any instruction on that evidence. Because trial counsel did not request such an instruction, any claim of trial court error is waived. Although Appellant tags on a bald claim of trial counsel ineffectiveness for failing to preserve this issue, this underdeveloped argument, as with many of the issues discussed above, fails meaningfully to discuss and apply the governing ineffectiveness standard. As such, his claim fails. *See Bracey, supra.*

### VI. Trial Court's Unanimity Instructions

Appellant next contends that his constitutional rights were violated because the trial court's instruction on unanimity improperly instructed the jury that it must find Appellant guilty, and that no other verdict was acceptable, even though the law allows and provides for circumstances where a jury cannot agree. The court stated:

No matter what your verdict may be, it must be unanimous, that is, it must reflect the unanimous choice of each and every one of you on each charge or count. Each and everyone of you must concur and agree on the final verdict which you will return here in open court. Any verdict which does not reflect the view of each and everyone of you would be improper and we could not accept it. In other words, you cannot come back in court and say that you are seven to five, nine to three, ten to two or anything like that. The verdict must be unanimous, either guilty or not guilty on each charge.

Notes of Testimony (N.T.) at 1484. Appellant contends that this instruction created a real risk that a juror would surrender his or her feelings and beliefs about the case in order to reach a unanimous verdict. In short, he claims this instruction was "judicial coercion." Brief for Appellant at 80. *See Commonwealth v. Chester,* 526 Pa. 578, 587 A.2d 1367, 1380

(1991) ("It is well-established that a verdict brought about by judicial coercion is a legal nullity."). Appellant also alleges trial counsel was ineffective for failing properly to preserve and litigate this issue at trial and on appeal.

We are again compelled to find the merits of this claim waived. Trial counsel did not object to the jury instruction at trial. Thus, the issue is not properly preserved. *Commonwealth v. Pressley*, 584 Pa. 624, 887 A.2d 220, 224 (2005). Moreover, Appellant's attempt to revive this claim under the rubric of ineffective assistance of counsel fails due to Appellant's failure to address meaningfully the necessary prongs of the ineffectiveness test. *See Jones, supra.*

## VII. Prosecutorial Misconduct

 Appellant's next claim involves multiple allegations of prosecutorial misconduct for making allegedly inflammatory and improper statements during closing arguments at both the guilt and penalty phases. Trial counsel objected to only one of the statements made by the prosecutor that Appellant now challenges. Thus, any challenges to statements to which counsel did not object are waived as they were not properly preserved. *Commonwealth v. Williams*, 541 Pa. 85, 660 A.2d 1316, 1320–21 (1995). As to the prosecutor's statement that was objected to, counsel did not pursue that issue on direct appeal, and thus waived it for PCRA purposes. *See* 42 Pa.C.S. § 9544(b). Appellant again attempts to preserve these issues by baldly blanketing them as claims of ineffective assistance of counsel. In conjunction with the serial failures to address the necessary prongs meaningfully, Appellant again fails to meet his burden on this issue. He merely tacks on a statement at the end of his argument that counsel was ineffective. Thus, the ineffectiveness claims must fail. *See Bracey, supra.*

## VIII. Jury Deliberations

 In his last guilt phase claim, Appellant argues that his due process rights and right to a fair and impartial jury were violated by the racial prejudice of one of the jurors,

predisposed opinions regarding Appellant's guilt, and delibera-
tive discussions that were held prior to formal deliberation.
Appellant references an declaration of one of the jurors, who
stated that race was an issue from the inception of the trial.
The juror stated in his declaration that "early in the trial one
of the other jurors commented on the race of the defendant.
He also noted the race of three victims and stated that, on
that basis alone, the defendant was probably guilty." Declara-
tion of Danny Mellow, January 11, 2000. The juror continued:

> I was upset that he would articulate his prejudice and
> speculate on the guilt of the defendant, ignoring the instruc-
> tions of Judge Bell.... His comments continued at other
> breaks and he made very racist remarks. First one juror,
> then two or three more gradually became drawn to his
> position as the first week wore on. These jurors also
> belittled the efforts of the defense lawyer. They were
> openly critical of him and actually made fun of him.

*Id.* The juror also stated that the juror that made the racist
remark said, during the trial, that Appellant should "fry, get
the chair or be hung." *Id.*

The general rule regarding post-verdict jury testimony is
codified in Pennsylvania Rule of Evidence 606(b), which states:

> Upon an inquiry into the validity of a verdict, ... a juror
> may not testify as to any matter or statement occurring
> during the course of the jury's deliberations or to the effect
> of anything upon that or any other juror's mind or emotions
> in reaching a decision upon the verdict or concerning the
> juror's mental processes in connection therewith, and a
> juror's affidavit or evidence of any statement by the juror
> about any of these subjects may not be received. However,
> a juror may testify concerning whether prejudicial facts not
> of record, and beyond common knowledge and experience,
> were improperly brought to the jury's attention or whether
> any outside influence was improperly brought to bear upon
> any juror.

Pa.R.E. 606(b). This rule is often referred to as the "no
impeachment rule." *Carter v. U.S. Steel Corp.,* 529 Pa. 409,
604 A.2d 1010, 1013 (1992) (plurality). We recognized in

*Carter* that the strict "no impeachment" rule provides a narrow exception for "post trial testimony of extraneous influences which might have affected [prejudiced] the jury during deliberations." *Carter*, 604 A.2d at 1013 (citing *Pittsburgh Nat'l Bank v. Mut. Life Ins. Co.*, 493 Pa. 96, 425 A.2d 383 (1981)). Under this exception, pursuant to *Carter*, the juror may testify only as to the existence of the outside influence, but not as to the effect this outside influence may have had on deliberations. *Carter*, 604 A.2d at 1013. Under no circumstances may jurors testify regarding their subjective reasoning processes. *Id.*

Despite Appellant's contentions, the exception to the general no impeachment rule is not implicated here. The exception only applies to *outside* influences, not statements made by the jurors themselves. *See Carter*, 604 A.2d at 1013. Here, one particular juror made some troubling statements. However, these statements were not based on any evidence not of record, or on any outside influences. Rather, one juror was attempting to influence the other jurors' opinion, although it was done inappropriately before deliberations. Indeed, Mr. Mellow's declaration states that the juror ". . . seemed to prey on the weaker jurors and tried to sway them." Declaration of Mr. Mellow. Nevertheless, the influence here was internal, not from outside sources. Once the verdict was entered, the jurors, including Mr. Mellow, became incompetent to testify regarding any internal discussions or deliberations. Pa.R.E. 606(b); *Carter, supra*. Therefore, Appellant's claim fails.

### Penalty Phase

### IX. *Atkins*

■ Appellant raises a claim that he is mentally retarded and that his death sentence is unconstitutional pursuant to *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002) (holding that the Eighth Amendment to the United States Constitution prohibits the execution of mentally retarded individuals). Appellant did not raise this claim before the PCRA court in the proceeding leading to this appeal and, in fact, could not have, because the decision in *Atkins* occurred

after Appellant filed his PCRA petition and the PCRA court denied relief, but before Appellant perfected his appeal to this Court.

Because Appellant could not have raised his *Atkins* claim before the PCRA court due to the pendency of his first PCRA petition, his only option is to raise it in a second PCRA petition filed within sixty days of the date of the order that finally resolves the first PCRA petition adjudicated herein. *See Commonwealth v. Lark*, 560 Pa. 487, 746 A.2d 585, 588 (2000). Of course, Appellant will still be required to plead and prove that one of the three exceptions to the time bar under 42 Pa.C.S. § 9545(b)(1) applies. *Lark;* 42 Pa.C.S. § 9545(b)(1) ("Any petition under this subchapter, including a second or subsequent petition, shall be filed within one year of the date the judgment becomes final, unless the petition alleges and the petitioner proves that ... (iii) the right asserted is a constitutional right that was recognized by the Supreme Court of the United States or the Supreme Court of Pennsylvania after the time period provided in this section and has been held by that court to apply retroactively."). At this juncture, however, this claim is waived. *See* Pa.R.A.P. 302(a) ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal."); *Commonwealth v. Edmiston*, 578 Pa. 284, 851 A.2d 883, 889 (2004) ("The proper vehicle for raising new claims is not on PCRA appeal, but rather in a subsequent PCRA petition, should appellant be able to satisfy the statutory restrictions on such serial filings."). It is dismissed without prejudice.

## X. Penalty Phase Closing Argument

We next address Appellant's challenge to counsel's closing argument during the penalty phase. As noted, Appellant was represented by two attorneys at the guilt and penalty phases: Attorney Liekar and Attorney Tershel. Attorney Liekar handled the vast majority of the pretrial investigation and preparation for the guilt and penalty phases, and Attorney Tershel was involved in the pre-trial investigation to a lesser extent. During trial, Attorney Tershel actually litigated the case

during the guilt and penalty phase and presented both closing arguments while Attorney Liekar, though present, did not say anything on the record. Attorney Liekar passed away following the direct appeal, before Appellant filed the PCRA petition raising claims of ineffectiveness. Consequently, only Attorney Tershel was available to testify at the PCRA hearing. In raising his various claims of counsel ineffectiveness, Appellant does not distinguish between these attorneys but generally refers to "counsel." It appears, however, given his references to Attorney Tershel's PCRA testimony, that when Appellant refers to "counsel," he is specifically referring to Attorney Tershel. He does not mention Attorney Liekar or acknowledge his role in preparing for trial. For ease of discussion, we will refer to counsel collectively as "counsel" and individually by name.

At the penalty phase hearing, Attorney Tershel presented the testimony of Mr. Stephens, who explained that when he was a small child, he was walking along a railroad bed when his foot became caught in the tracks. A train was fast approaching, and Mr. Stephens was unable to free himself. Although there were other people around at the time, only Appellant risked his life to do anything. Appellant ran from "out of nowhere," N.T. at 1556, and saved Mr. Stephens's life by throwing him from the track at great personal peril. Additionally, Appellant's mother testified. She corroborated Mr. Stephens' testimony and told the jury that as a result of saving Mr. Stephens' life, Appellant received the Carnegie Hero Award, which included $500 and a bronze metal. She also testified that although Appellant had been in jail before, he had never been violent or harmed anyone; had never flown into a fit of rage; and had always been protective and loving to his family. N.T. at 1559–60. This evidence was offered in support of the catch-all mitigating factor. See 42 Pa.C.S. § 9711(e)(8).

Appellant contends that rather than focusing on this mitigation evidence in closing, Attorney Tershel effectively abandoned him by attacking the jury's guilt-phase verdict, implying that the jury rushed the verdict so that the jurors could go

home, and suggested that it would similarly rush to a death verdict. The entirety of Attorney Tershel's penalty phase argument follows:

Ladies and gentlemen, you've reached a verdict of guilty in this case. I can see somewhat how you come to that conclusion, but I don't know how you can be so sure to convict someone to die. There still is no hard evidence that Roland Steele ever harmed anyone here. We have circumstantial evidence that he committed a robbery and committed a theft, but you've got nothing that he harmed anybody. You wouldn't listen to the witnesses who testified that there was not evidence that he harmed them with his hands and there was no blood or fingernail scrapings, nothing. You just listened to what happened to these women which is bad. You got caught up like everybody got caught up. This man never did anything to hurt anybody before. Do you think that he would do this one time and he would just lose control? Why? He saved a kid's life. No-one else would risk his life. He's not a harmful citizen. We told you that going in, he's not a killer either and there is no evidence that he's killed these women.

How could you kill someone? How could you beat someone and have nothing on you and no blood? Where did that blood come from?

You got caught up. You were in a hurry to go home. Well, let's see, it's almost lunch. Maybe you can get a decision before lunch.

If you don't think life imprisonment is bad enough punishment in this case ... You've waited over there for two weeks, being couped-up [sic] in that hotel. Figure that's the rest of your life, isn't that enough?

They said they don't want vengeance. What the hell do you call it ... justice, an eye for an eye? That's justice? You think that about the case and you think about it. You think about what you heard and you decide.

N.T. 1560–62. Following this argument, Attorney Tershel left the courtroom while court was in still in session, never to return. He did not come back to hear the Commonwealth's

closing argument, nor the judge's instructions to the jury. Co-counsel, Attorney Liekar, who had not spoken on the record during the entire trial, remained at the counsel table.

Appellant argues that Attorney Tershel made no argument to encourage the jury to conduct the necessary adversarial testing of the Commonwealth's evidence. Nor did he make a plea for mercy or spend any meaningful time on the mitigating circumstances he sought to establish. In summary, Appellant argues that Attorney Tershel had no reasonable basis for his actions, and that there can be no reasonable basis for ". . . defense counsel to make an argument that attacks and insults the jury that will decide his client's fate." Brief for Appellant at 23.

These observations lead, in Appellant's view, to the conclusion that counsel effectively abandoned him, amounting to a complete denial of Appellant's right to counsel pursuant to the Sixth Amendment to the United States Constitution. *See United States v. Cronic*, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984). As such, Appellant maintains that he need not prove prejudice under the test for ineffectiveness. Alternatively, Appellant argues that he was, in fact, prejudiced by counsel's actions. He argues that counsel's conduct was professionally unreasonable and was not designed to advance Appellant's interests. In conclusion, Appellant asserts that "[i]t is also reasonably likely that if counsel had not failed to focus the jury on any of the applicable mitigation, or if he had refrained from insulting the jury, or if he had simply sat back down next to his client and not thrown in the towel, at least one member of the jury would have voted for a life sentence, after weighing the aggravating and mitigating circumstances." Brief for Appellant at 24.

At the PCRA hearing, Attorney Tershel explained his closing argument as follows:

Q. Do you remember after you made that closing argument leaving the penalty phase, walking out of the courtroom?

A. I left.

Q. Why did you do that?

A. I had nothing more to say.

N.T. PCRA at 79. Later, he indicated that walking out of the courtroom was not something he planned to do, but that he left because he did not want to hear the Commonwealth's closing argument. *Id.* at 201–02.

The PCRA court rejected Appellant's claim of trial counsel ineffectiveness, finding that it lacked arguable merit. The court noted that Attorney Tershel reminded the jury of Appellant's action of saving someone's life and that he was not a violent person. The court also found that Attorney Tershel pled for mercy with the statement "If you don't think life imprisonment is bad enough punishment in this case ... You've waited over there for two weeks, being couped-up [sic] in that hotel. Figure that for the rest of your life, isn't that enough?" Finally, the court found that Attorney Tershel "strongly" directed the jury to consider the mitigation evidence with the statement: "You think about what you heard and you decide." PCRA Ct. Op. at 47. The PCRA court also found that Attorney Tershel had a reasonable basis for his actions: it was "clear ... that counsel made his argument to appeal to any residual doubt that the jury might have had," *id.*, a strategy the court found was not constitutionally prohibited. The court continued:

> It is clear that some of trial counsel's comments to the jury were meant to be sarcastic and to shock the jury into questioning whether they were so convinced of the petitioner's guilt that they would sentence him to death. Likewise, trial counsel's conduct in leaving the courtroom after delivering his penalty phase argument, while not something this court encourages, may have served to impress upon the jury the seriousness of the matter and cause them to spend more time deliberating on the appropriate sentence. . . . While the jury did not deliberate long on this sentence, it is not unreasonable for trial counsel to adopt this type of tactic.

*Id.* at 48–49.

▪ *Cronic* relieves an appellant from the burden of proving prejudice where there has been an actual or constructive

denial of counsel, *i.e.*, when counsel's failure has been complete and it is as if the right to counsel has been denied. *See Florida v. Nixon*, 543 U.S. 175, 125 S.Ct. 551, 160 L.Ed.2d 565 (2004); *Commonwealth v. Mallory*, 596 Pa. 172, 941 A.2d 686, 700 (2008); *Commonwealth v. Reaves*, 592 Pa. 134, 923 A.2d 1119, 1128 (2007). In *Reaves*, this Court described the operation of *Cronic's* presumption of prejudice:

> *Cronic* recognized that in some cases, the prejudice inquiry of *Strickland* is not required because there are certain circumstances "that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." 466 U.S. at 658, 104 S.Ct. at 2046. *Cronic* suggested that where there has been a complete denial of counsel or where the circumstances are such that any competent attorney would be unable to provide effective assistance, a defendant need not demonstrate that he was prejudiced by counsel's actions. *Id.* at 659–62, 104 S.Ct. at 2047–48. The presumed prejudice exception to *Strickland* has been found to apply where there was an actual or constructive denial of counsel, the state interfered with counsel's assistance, or counsel had an actual conflict of interest. *See* [*Smith v. Robbins*, 528 U.S. 259, 120 S.Ct. 746, 145 L.Ed.2d 756 (2000) ].

*Reaves*, 923 A.2d at 1128. *See also Commonwealth v. Puksar*, 951 A.2d 267, 292–93 (Pa.2008).

The U.S. Supreme Court, however, has emphasized that such instances are rare. *See Nixon*, 543 U.S. at 190, 125 S.Ct. 551 (holding that a showing of actual prejudice was required where the defendant claimed that counsel was ineffective for conceding guilt at the guilt phase of a capital trial). Furthermore, this Court has stressed that *Cronic* is limited to cases where "the acts or omissions of counsel were of the type that are virtually certain to undermine confidence that the defendant received a fair trial or that the outcome of the proceedings is reliable, primarily because they remove any pretension that the accused had counsel's reasonable assistance during the critical time frame." *Mallory*, 941 A.2d at 700 (quoting *Commonwealth v. Cousin*, 585 Pa. 287, 888 A.2d 710, 718

(2005)). *See, e.g., Commonwealth v. Halley*, 582 Pa. 164, 870 A.2d .795, 801 (2005) (prejudice presumed where counsel failed to file statement of matters complained of on appeal, which led to waiver of all claims); *Commonwealth v. Lantzy*, 558 Pa. 214, 736 A.2d 564, 572 (1999) (prejudice presumed where counsel's failure to file requested direct appeal was unjustified). In *Nixon*, the High Court reiterated that *Cronic* is limited to situations where counsel's failure is complete, *i.e.*, where "counsel has entirely failed to function as the client's advocate." *Nixon*, 543 U.S. at 189–90, 125 S.Ct. 551. *Accord Cousin*, 888 A.2d at 719 (*Cronic* presumption of prejudice not triggered when trial counsel concedes guilt of lesser crime in closing argument of bench trial).

In light of this precedent and the nature of Appellant's argument, this issue falls squarely within the *Strickland* prejudice line of cases, and not within *Cronic's* limited exception. The present circumstance—where Attorney Tershel presented the testimony of two witnesses in support of mitigation, elicited testimony favorable to Appellant, and conducted a penalty phase closing argument, and where Attorney Liekar remained in the courtroom after counsel walked out—is unlike the presumed prejudice scenarios found in *Lantzy* and *Halley*, where counsel's lapse caused the complete default of direct appeals requested by the client. We cannot conclude that Attorney Tershel entirely failed to function as Appellant's advocate. *See Nixon*, 543 U.S. at 189–90, 125 S.Ct. 551. Therefore, the brief nature of the closing argument and Attorney Tershel's decision to walk out at the conclusion does not alone prove that he was ineffective. It is Appellant's burden to prove he was prejudiced by counsel's actions in accord with *Pierce*, 527 A.2d at 975.

In the context of ineffective assistance of counsel, prejudice means "demonstrating that there is a reasonable probability that, but for counsel's error, the outcome of the proceeding would have been different." *Commonwealth v. Cox*, 581 Pa. 107, 863 A.2d 536, 546 (2004); *Strickland, supra.* A death penalty jury must weigh any aggravating circumstances that it has determined were proven beyond a reason-

able doubt against any mitigating circumstances that it finds by a preponderance of the evidence. 42 Pa.C.S. § 9711(c). Only when the jury determines that the aggravating circumstances outweigh the mitigating circumstances can the jury impose a death sentence. It must, however, unanimously agree. *Id.* If the jury does not unanimously agree, a life sentence must be imposed. Thus, to impose a life sentence, only one juror has to find that the mitigating circumstances outweighed the aggravating circumstances.

Attorney Tershel faced a difficult task in this regard after the jury rejected Appellant's claim of innocence and returned three guilty verdicts for first degree murder. The jury had just found Appellant guilty of brutally beating to death three elderly women. On direct appeal, this Court described the horrific nature of the killings in passing upon Appellant's challenge to the sufficiency of the evidence to support the torture aggravator:

> The evidence established that the victims were mercilessly beaten to death in the presence of each other. Doctor Abernathy testified that he performed the first autopsy on the body of Lucille Horner. He stated that the left lobe of her thyroidal gland was almost torn away from the windpipe and that the voice box, larynx, and the vocal cord were torn away. He stated the liver was almost completely shattered and that there was hemorrhaging in the kidneys and the pelvis area of the kidneys. Further that seven (7) ribs on the right side of the rib cage and 8 on the left, had been broken and vertebra to the back bone, had been broken. He testified that the right side of the heart had been almost shattered by a very hard blow. Doctor Abernathy described the conditions of the other bodies as well. He testified that the pattern of injury he found with the autopsy of Mrs. Horner was quite similar to that which he found in subsequent autopsies. He described the injuries in detail to the jury. Notably he testified that Mrs. Kuntz was probably dead or was dying from asphyxia, due to the blow to her throat, before her liver was shattered and her heart was severed. It is reasonable to assume from the nature and

extent of the beatings, that the victims suffered considerably. A reasonable inference can be drawn from the method used to kill his victims, that the [appellant] did in fact intend to inflict great pain before he actually did kill. Furthermore Doctor Abernathy described the victims as very old and quite fragile, and the evidence established and the defense stipulated that, the appellant was a martial arts expert and thus the jury could have properly inferred that the appellant's beating of each victim was unnecessary [sic] painful and was done merely to torture them before striking the final death blow.

*Steele*, 559 A.2d at 912–13 (footnote omitted). The gruesome circumstances of these killings supported the three aggravating factors the jury found, 42 Pa.C.S. § 9711(d)(6) (killing in the perpetration of a felony), (d)(8) (torture), and (d)(10) (multiple murder), and made more difficult the usual penalty phase task of obtaining a sentence of life in prison. Attorney Tershel's task was further complicated by the fact that this trial was for three murders, by the age, frailty, and helplessness of the three victims, by the fact that the killings were accomplished by means of torture, and by the fact that Appellant denied the killings. The assertion of innocence raised the dilemma of arguing to the jury that Appellant did not commit the murders, but if he did, there were other things to consider.

Nevertheless, despite these difficulties, Attorney Tershel presented two mitigation witnesses in support of the catch-all mitigator, 42 Pa.C.S. § 9711(e)(8). Further, despite Attorney Tershel's course of action in failing to argue specifically that the jury should find the catch-all mitigator and balance the mitigation evidence against the Commonwealth's aggravating circumstances, the jury found the existence of the catch-all mitigator. For all that Appellant argues regarding counsel ineffectiveness in this closing argument, he fails to acknowledge that the jury obviously considered the evidence presented despite (or perhaps because of) the nature of the closing argument.

Given the nature and circumstances of the crimes, the aggravating factors submitted by the Commonwealth, and the jury's finding of the catch-all mitigator, we conclude that there is no probability that if Attorney Tershel had emphasized the mitigating value of the evidence, particularly that Appellant saved Mr. Stephens' life, rather than speaking as he did and then walking out, the jury would have returned a verdict of life imprisonment rather than death. Therefore, Appellant has not demonstrated prejudice. *See Commonwealth v. Marshall,* 571 Pa. 289, 812 A.2d 539, 549 (2002) (where the penalty phase jury found the existence of the catchall mitigating circumstance based on the testimony presented, the claim of ineffectiveness fails for lack of prejudice).

## XI. Ineffectiveness for Failing to Investigate and Present Life History and Mental Health Mitigation Evidence

 Having concluded that Appellant has not demonstrated that he was prejudiced by Attorney Tershel's penalty phase closing argument, we next address his assertions that counsel were ineffective for failing to investigate and present life history and mental health mitigation. Attorney Tershel and his investigator testified at the limited PCRA hearing regarding the scope of the investigation and presentation of mitigating evidence. Before addressing Appellant's arguments, we will review the evidence presented at the penalty phase, the evidence provided to the PCRA court, and the PCRA testimony.

Counsels' penalty phase case consisted of two witnesses. As noted, Mr. Stephens testified that when he was a small child, his foot became caught in the train tracks as a train was fast approaching. Although several people were around, only Appellant risked his life to save him. Appellant's mother, Ms. Clemons, corroborated Mr. Stephens' testimony and described that as a result of his heroism, Appellant received a bronze metal and $500 from the Carnegie Hero Award Commission. Ms. Clemons further testified that although Appellant had been previously incarcerated, he had never been violent or

harmed anyone, was always protective of and loving to his family, and was not the type of person to strike someone in a fit of rage.

In support of his argument that trial counsel were ineffective for failing adequately to investigate, develop, and present available life history and mental-health mitigation, Appellant submitted to the PCRA court the declarations of several family members who explained that while Appellant was growing up, he was subjected to abject poverty, little supervision, and physical, mental, and emotional abuse from his parents and step-parents; he was ostracized at school because of his family's poverty; his parents were unable to support the family; because Appellant was the oldest of ten children, he was forced to take care of his siblings long before he was mature enough for such adult responsibility; Appellant witnessed his parents' verbal and physical fights and bore the brunt of their physical and emotional abuse; he was subjected to racism and discrimination; and Appellant suffered significant head injuries on two occasions, for which he did not receive any medical treatment, and which caused headaches and withdrawn behavior.[21] The family members further asserted that while Appellant was growing up, the adults in his life taught and encouraged him to steal to provide food for the family. As an adult, he continued this trend, committing numerous nonviolent burglaries, resulting in incarceration for most of his adult life.

As further support for his argument that counsel ineffectively failed to investigate and present mental health mitigation, Appellant submitted to the PCRA court the May 15, 2000 declaration of Dr. George Woods, a licensed physician specializing in psychiatry and neuropsychiatry, who conducted a psychiatric evaluation of Appellant and reviewed unidentified background materials regarding Appellant and the offenses. Dr. Woods concluded that Appellant experienced a traumatic

---

**21.** Specifically, Appellant's sister stated that when Appellant was thirteen years old he crashed while riding a bike, and landed on his head. *See* Declaration of Lavonne Scott, January 1, 2000. In another incident, Appellant "got cracked in the head by some guy," which led to recurrent headaches. *Id.*

childhood and had a history of head injuries that resulted in a cognitive disorder not otherwise specified that was evident as impairments of memory, inhibition, problem solving, and executive function. Dr. Woods stated that although Appellant adjusted well to the structured prison setting, he suffered from traumatic stress, which further impaired his functioning in high tension situations. As a result of his evaluation, Dr. Woods determined that at the time of the murders in 1985, Appellant suffered from an extreme mental or emotional disturbance that impaired his ability to conform his conduct to the requirements of the law. *See* 42 Pa.C.S. § 9711(e)(2), (3).

Dr. Carol Armstrong, a licensed psychologist specializing in neuropsychology, stated in a May 11, 2000 declaration that Appellant suffers from frontal lobe dysfunction resulting from his accidental head injuries.[22] In Dr. Armstrong's opinion, Appellant's impairments make it difficult for him to learn from experience or to understand the consequences of his conduct. Dr. Armstrong concluded that at the time of the offenses, Appellant suffered from an extreme mental or emotional disturbance that substantially impaired his ability to conform his conduct to the requirements of the law.

Dr. Henry Dee, a licensed clinical psychologist, submitted a sworn affidavit dated May 12, 2000, stating that Appellant suffered from cerebral lobe damage which has caused him to be seriously psychologically impaired since before the offenses, and this cerebral damage substantially impaired his capacity to appreciate the consequences of his actions or conform his conduct to the law. Dr. Dee further concluded that the burdens placed on Appellant throughout his childhood constituted mitigating circumstances.

Finally, Appellant submitted the October 28, 1985 psychiatric evaluation of Dr. Berkey, which, as noted, was conducted in connection with the guilt phase of this case at the request of trial counsel. Dr. Berkey's evaluation stated that he had the

---

22. Dr. Armstrong referenced a "significant history of head trauma," including at least one injury in childhood and ten years of pugilistic sport activity including frequent kicks and punches to his head. She did not identify when the sports-related head injuries occurred.

sense that Appellant was on stage, trying to make a favorable impression. Appellant "seemed to derive gratification from the attention and notoriety, although he stated the opposite." Psychiatric Evaluation of Dr. Berkey, October 28, 1985. Dr. Berkey felt that Appellant "evidenced some grandiose and paranoid tendencies," but that Appellant's "thinking was highly organized, with reality-testing intact. There was no indication of bizarre or frankly delusional ideation. He did not seem psychotic or in any way incompetent to stand trial." *Id.* Dr. Berkey's diagnosis was antisocial personality. *Id.*

Turning to the testimony produced at the PCRA hearing, Michael Reid, who counsel hired to conduct an investigation to assist their defense of Appellant, testified that Appellant's was the first capital case he had worked on, and that counsel did not request his assistance in connection with the mitigation case until after the guilty verdict. At that time, Mr. Reid contacted Mr. Stephens, who Appellant had saved from the train, and secured his testimony for the penalty phase. Mr. Reid testified that counsel did not request that he obtain the Carnegie Hero Award file completed in connection with Appellant's award for saving Mr. Stephens' life. Attorney Tershel did, however, direct Mr. Reid to speak to Appellant's sister, Lavonne Scott, to obtain information about Appellant's family background and childhood. N.T. PCRA at 39–40. Consequently, Mr. Reid discussed Appellant's childhood with his sister at the courthouse following the guilty verdict, and learned of Appellant's general background, abject poverty, family history, and Appellant's role in committing robberies because of his family's dire economic straights. N.T. PCRA at 24–26. In the course of his investigation, Mr. Reid visited Appellant's childhood home, which he characterized as "squalid." N.T. PCRA at 26. Mr. Reid conveyed this information to Attorney Tershel, who did not request that he investigate further. N.T. PCRA at 26, 41. Mr. Reid recalled that the focus of the mitigation investigation had been the Carnegie Hero Award. N.T. PCRA at 31.

Attorney Tershel had difficulty recalling his preparation for the penalty phase due to the passage of time between the

January, 1986 trial and the May, 2000 PCRA hearing. He could not recall the scope of his mitigation investigation. He stated that before trial, he "personally, probably did nothing" to prepare for the penalty phase; he could not recall. N.T. PCRA at 95. To the best of his recollection, Attorney Tershel had focused on the guilt phase and "certainly wasn't planning on worrying about the sentencing, I was planning on defending him, which I think I did." N.T. PCRA at 92. With regard to the penalty phase, Attorney Tershel's mitigation strategy was to focus on Appellant's role in saving Mr. Stephens' life, and argue that "society owed him one back." N.T. PCRA at 74. In furtherance of this goal, he stated that he called the two best witnesses they had: Ms. Stephens and Appellant's mother. N.T. PCRA at 116, 198 ("He saved someone's life, I was hoping the jury would save his life."). He stated that although he could not remember the details of his preparation, he made a judgment call to prey on the jury's residual doubt about Appellant's guilt by focusing on Appellant's heroic act of saving Mr. Stephens' life, N.T. PCRA at 196 ("I thought that was the only chance we had"), and did not believe that introducing evidence of Appellant's impoverished background would help his case. *Id.*

Attorney Tershel explained his lack of participation in the penalty phase investigation by noting that Attorney Liekar was likely involved with that aspect of the investigation, although Attorney Tershel could not recall specifically what Attorney Liekar had done to prepare for the penalty phase. N.T. PCRA at 91–92, 222–23. Attorneys Tershel and Lieker had the resources of the public defender's office at their disposal, and "apparently" sent some people from the office out to investigate mitigation. N.T. PCRA at 196. Attorney Tershel testified that his assignment was to try the guilt phase, N.T. PCRA at 93, 97, and that by the time he became involved, "[a]ll the preliminary stuff had been finished." *Id.* at 85. When it was time to try the penalty phase, Attorney Tershel stated that he was "given the information that we had that would be mitigating and that I felt was important to tell the truth, that's what we did, we gave the best evidence that

we had......" N.T. PCRA at 93. Attorney Tershel indicated that he may have obtained the Carnegie Hero Fund Investigative Report, which indicated that Appellant grew up poor in a large family it, but he could not recall. N.T. PCRA at 62–63. When questioned about why Attorney Tershel did not ask Appellant's mother about his childhood, he responded that he did not believe it relevant that Appellant had a large family or grew up poor:

A. I didn't see any reason—why would I say this—is that what you're asking me, why I didn't say he has five brothers and sisters?

Q: About the poverty in his family?

A: I know a lot of poor people. I didn't think that was going—you know, you don't want to diffuse what you have. You have a Carnegie Award. What, I'm going to ask him if he has five brothers or sisters? What is your logic there?

N.T. PCRA at 67. Attorney Tershel felt it was "ludicrous" to present evidence that Appellant had a large family. N.T. PCRA at 73, 93.

Although his recollection was poor, Attorney Tershel recalled that he discussed witnesses with Mr. Reid and Attorney Liekar many times, N.T. PCRA at 96, and he recalled talking to Ivory Wade, one of Appellant's family members, several times after the conclusion of the guilt phase. N.T. PCRA at 98–99. Further, Attorney Tershel was aware that Appellant had a long history of being incarcerated for burglaries. N.T. PCRA at 54, 186. In the course of preparing for the penalty phase, Attorney Tershel contacted Attorney Romaine, Appellant's counsel from a prior burglary, to discuss Appellant and determine what kind of witness Appellant was. N.T. PCRA at 58, 98. Attorney Romaine conveyed her belief that Appellant would make a good witness. *Id.* Although Attorney Tershel did not remember interviewing Appellant's family specifically about his upbringing, N.T. PCRA at 83, he testified that he was aware of the economic conditions of Appellant's childhood, and knew Appellant's parents were divorced. N.T. PCRA at 144–45. He stated that he had no reason to believe that Appellant was abused. *Id.* at 147.

Regarding discussions with Appellant, Attorney Tershel testified that he talked to Appellant all the time and discussed the case with him every day during the trial. N.T. PCRA at 194, 222. They talked about Appellant's life and other aspects, and Appellant appeared competent and was cooperative. N.T. PCRA at 84, 128–29. Although he talked to Appellant's family "numerous times," *id.* at 198, he could recall nothing from interviews and conversations with Appellant's family members or Appellant that would have made him aware of any mental problems from which Appellant suffered, and he had no reason to doubt Dr. Berkey's conclusion that Appellant was competent. N.T. PCRA at 127–29, 203 (agreeing that no family member had ever indicated that Appellant "hasn't been right since any event . . . or he had an accident."); *Id.* at 185–86 (stating there was nothing that indicated that Appellant was suffering from any sort of mental impediment and Appellant did not reveal that he suffered from anything); *Id.* at 197 (no one told Attorney Tershel that Appellant might have any mental health issues). Attorney Tershel also indicated that he was not involved in the case when Dr. Berkey's pre-trial report was written, in October, 1985, and he believed that Attorney Liekar secured the report. N.T. PCRA at 121, 129, 151.

Upon consideration of Appellant's arguments and the PCRA testimony of Mr. Reid and Attorney Tershel, the PCRA court rejected Appellant's claim of ineffectiveness for failing to investigate and present life history and mental health mitigation evidence. As a preliminary matter, the PCRA court found that Attorney Lieker handled the vast majority of pretrial investigation and preparation. Further, the PCRA court found significant the time that had lapsed between trial and the PCRA hearing, which caused both the unavailability of Attorney Liekar due to his death and Attorney Tershel's lack of recollection about Appellant's trial. Finally, the PCRA court found that because Appellant had waited so long to file his PCRA petition, it was difficult for the Commonwealth to rebut Appellant's assertions, and it considered this delay as a factor weighing against the credibility of Appellant's evidence.

PCRA Ct. Op. at 35 (citing *Commonwealth v. Alexander*, 495 Pa. 26, 432 A.2d 182 (1981) and *Commonwealth v. McAndrews*, 360 Pa.Super. 404, 520 A.2d 870 (1987)).[23]

Examining the arguable merit prong of Appellant's claim with respect to life history mitigation, *see Pierce*, 527 A.2d at 975, the PCRA court found that the declarations from Appellant's family were not credible because of the "timing of the completion of these [declarations], and the fact that they are from [Appellant's] family." PCRA Ct. Op. at 38. Noting Attorney Tershel's PCRA testimony that he was aware of Appellant's life history, the PCRA court concluded that trial counsel did, in fact, question either Appellant or his family about his childhood environment.[24] Consequently, the PCRA court found Appellant had not demonstrated the arguable merit prong of his contention that trial counsel failed adequately to investigate and develop potential mitigating evidence concerning Appellant's life history. Even assuming arguable merit, however, the PCRA court further found that trial counsels' decision not to introduce life history evidence was a reasonable tactical decision because Attorney Tershel testified that it would not be helpful in view of the trial strategy to portray Appellant as peaceful and heroic. PCRA Ct. Op. at 39.

23. Specifically, the PCRA court noted that although PCRA counsel was appointed in 1997, the family's declarations were not completed until after Attorney Liekar's death in 1999. Appellant offered no explanation for the delay from 1997 to 2000, when he filed his amended PCRA petition raising, for the first time, allegations of ineffectiveness.

24. In his dissenting opinion, Justice Saylor asserts that we have strayed into uncharted territory by authorizing the PCRA court to render credibility determinations on the basis of the content of the declarations of Appellant's family members rather than requiring an evidentiary hearing with regard to such declarations. Pennsylvania Rule of Criminal Procedure 909(B) requires a court to hold an evidentiary hearing on all genuine issues of material fact raised in a capital PCRA petition. The PCRA court's decision not to hold a hearing will only be reversed when the court abused its discretion. *Commonwealth v. Collins*, 585 Pa. 45, 888 A.2d 564, 579 (2005). Here, the PCRA court determined that the factual issues could be resolved on the record without hearing testimony from Appellant's family, and, thus, there was no need for the court to hold a hearing. We see no abuse of discretion in this determination.

Addressing Appellant's claim of ineffectiveness with regard to mental health mitigation, the PCRA court found that Appellant failed to prove the arguable merit prong of his claim of trial counsel ineffectiveness. *See Pierce*, 527 A.2d at 975. The court found that the declarations submitted by Drs. Woods, Armstrong, and Dee were not credible for several reasons: they appeared to be based on information received from Appellant and his family, which, in the PCRA court's view, diminished their value; there was no medical report or other evidence verifying the alleged head injuries Appellant claimed to have suffered which gave rise to alleged mental impairments; and the evaluations were conducted fifteen years after the murders. *See* PCRA Ct. Op. at 41.

Having determined that Appellant's ineffectiveness claim regarding the investigation of mental health mitigation lacked merit, the PCRA court also addressed the reasonable basis prong of the test for counsel ineffectiveness. *See Commonwealth v. Malloy*, 579 Pa. 425, 856 A.2d 767, 784 (2004) ("we focus on whether the investigation supporting counsel's decision not to introduce mitigating evidence . . . was itself reasonable."). The PCRA court concluded that trial counsel's investigation was reasonable under the circumstances. Specifically, based upon the opinion of Dr. Berkey, who evaluated Appellant prior to trial and concluded that Appellant was competent, and Attorney Tershel's testimony that Appellant was cooperative, competent, and able to communicate, the PCRA court found that trial counsel had no reason to investigate Appellant's mental health further because there was no cause to suspect that Appellant suffered from mental health problems, and that counsel, therefore, reasonably did not pursue mental health mitigation.

Before this Court, Appellant argues the three prongs of his claim of counsel ineffectiveness for failing to investigate and present evidence of Appellant's life history and mental health. Regarding the arguable merit prong of these ineffectiveness claims, Appellant states that all of his family members were available to counsel before and during his trial, as was the Carnegie Hero Award file, and that counsel should have

398

spoken to his family, become aware of the facts contained in the family's declarations, and obtained the Carnegie Hero Award file. From these sources, Appellant argues that counsel should have discovered that Appellant had a large family, lived with unemployed parents in poverty, and did poorly in school. Further, Appellant asserts that trial counsel was aware of his extensive criminal background, but failed to contact Attorney Romaine, his prior counsel, to ask about family or mental health mitigation. Had counsel made such inquiries, Appellant asserts that Attorney Romaine would have shared her opinion that Appellant had cognitive difficulties. Appellant further asserts that counsel failed to ask Dr. Berkey to conduct a forensic evaluation for the purpose of presenting mental health mitigation, and failed to provide him with unspecified "background materials." Brief for Appellant at 27. Additionally, Appellant refers to Dr. Berkey's conclusion that Appellant suffered from grandiose and paranoid tendencies and from a personality disorder, which he argues should have informed trial counsel of potential mental health issues.

Turning to the reasonable basis prong of his claim that counsel was ineffective for failing to investigate life history and mental health mitigation, Appellant points to Attorney Tershel's lack of recollection about the penalty phase investigation as evidence that the investigation was not reasonable. He asserts that counsel unreasonably gave no thought to the penalty phase until after the guilty verdict. If counsel had acted reasonably and discovered evidence of Appellant's poor and abusive upbringing and two head injuries, Appellant argues they would have obtained and presented mental health evaluations. Because trial counsel did not conduct a reasonable investigation, Appellant asserts he was prejudiced because the jury did not hear of Appellant's life history or mental health mitigation. *See Commonwealth v. Perry,* 537 Pa. 385, 644 A.2d 705, 709 (1994); *Strickland,* 466 U.S. at 668, 104 S.Ct. 2052.

Quite unhelpfully, the Commonwealth's meager argument on this point is, simply, that Appellant was represented by

competent counsel who reasonably determined that the jury was not going to spare Appellant's life if it heard that he had a hard childhood.

After careful review of the record and consideration of Appellant's claims, we conclude that the PCRA court's ruling is free of legal error and supported by the record. *See Washington*, 927 A.2d at 593–94; *Breakiron*, 566 Pa. 323, 781 A.2d 94; *Strong*, 761 A.2d at 1170, n. 3.[25] As explained below, Appellant has not established the three prongs of counsel ineffectiveness for failing to investigate and present life history and mental health mitigation. We will examine these two categories of evidence and Appellant's arguments separately. Preliminarily, we note that Appellant's ability to meet his burden and prove that counsel was ineffective in regard to the mitigation investigation is impacted by the passage of fourteen years between counsels' alleged ineffectiveness at the 1986 trial, and the PCRA hearing in 2000. While Attorney Liekar was not available to testify, Attorney Tershel understandably had difficulty recalling the specific nature of the investigation and conversations he had with Appellant and family members. Appellant points to these failings as proof that counsel did not reasonably investigate available avenues of mitigation. We disagree with Appellant that the unavailability of Attorney Liekar and the inability of Attorney Tershel to recall details of the investigation proves that counsels' investigation of possible mitigation evidence was inadequate. It is Appellant's burden to prove the lack of a reasonable investigation. If Appellant's task is made more difficult by the passage of time and likely loss of memory, it does not follow that Appellant can meet his burden by raising an inference of ineffectiveness premised on Attorney Tershel's lack of memory. While Appellant's burden to prove counsel's ineffectiveness is made more difficult, it is not obviated or lessoned by these circumstances. *See Commonwealth v. Rega*, 593 Pa. 659, 933 A.2d 997, 1018–19 (2007)

25. Our scope of review is limited to whether the findings of the PCRA court is free from legal error and supported by the record when such evidence is viewed in the light most favorable to the Commonwealth, as the prevailing party. *See Collins*, 888 A.2d at 580, n. 21.

("The burden of proving ineffectiveness rests with Appellant").[26]

We analyze first the arguable merit prong of Appellant's argument that counsel was ineffective for failing to investigate and present life history mitigation, see Pierce, 527 A.2d at 975. To establish the first prong of the test for counsel ineffectiveness, see Pierce, 527 A.2d at 975, Appellant must prove that the underlying legal claim—i.e., that which he charges was pursued improperly—has "arguable merit." In terms of a claim for ineffectiveness resulting from penalty phase counsel's failure to investigate and present mitigating evidence, this involves proving that there was substantial information available at the time of trial that counsel should have investigated and that would have supported statutory mitigating circumstances. See Commonwealth v. Jones, 590 Pa. 202, 912 A.2d 268, 292 (2006). With this standard in mind, we conclude that the record supports the PCRA court's finding that Appellant has not demonstrated that trial counsel failed to investigate life history mitigation. Rather, as described in the PCRA court testimony, counsel and their investigator did, in fact, investigate Appellant's life history. Attorney Tershel, who was aware that Appellant grew up in a large, poor family, and that Appellant's parents were divorced, N.T. PCRA at 145, directed Mr. Reid to look into Appellant's background, believing this information would be "helpful." Id. at 39–40. In carrying out this assignment, Mr. Reid talked to Appellant's sister, Ms. Scott, who described Appellant's background and family history and that Appellant helped raise and feed

26. Appellant asserts that the PCRA court was not entitled to rely on Appellant's problems of proof resulting from the passage of time and attending difficulties because the Commonwealth failed to assert before the PCRA court that it was prejudiced. Whether the Commonwealth failed to argue prejudice is not relevant: it is Appellant's burden to prove ineffectiveness. What the Commonwealth chooses to argue, or not argue, as the case may be, does not lesson Appellant's burden in this regard. We are troubled by the Commonwealth's failure to advocate this case, and specifically reference the Commonwealth's one sentence answer on this issue before the PCRA court and one paragraph argument before this Court. This lack of advocacy from the Commonwealth, however, does not alter the fact that Appellant has the burden of proof.

the family. N.T. PCRA at 24–26. Mr. Reid visited Appellant's "squalid" childhood home, and conveyed his impressions of it to Attorney Tershel. *Id.* at 26. Additionally, Attorney Tershel recalled personally talking to Ms. Wade several times. *Id.* at 99. This testimony supports the PCRA court's conclusions that trial counsel did, in fact, conduct a reasonable investigation of Appellant's family background. We will not find counsel ineffective for failing to uncover background evidence where the evidence shows that counsel did, in fact, investigate and discover such evidence. Appellant, therefore, has not carried his burden with regard to the arguable merit prong of his claim regarding life history mitigation.

Even if we were to assume the arguable merit of Appellant's argument regarding counsel ineffectiveness for failing to investigate life history mitigation, we also find that the evidence credited by the PCRA court supports its finding that Attorney Tershel's decision not to introduce life history evidence was a reasonable, tactical decision. Information about Appellant's childhood environment did not fit into counsels' mitigation strategy to portray Appellant as heroic and nonviolent. *See* N.T. PCRA at 67 ("I didn't think that [evidence of Appellant's poverty] was going, you know, you don't want to diffuse what you have."); *Id.* at 73 (describing as ludicrous the idea that counsel should have presented evidence of Appellant's poverty and large family); *Id.* at 93 (indicating that evidence of a large, poor family did not fit into counsel's mitigation strategy). Based on his investigation, counsel concluded that the mitigation case would be stronger if he limited the evidence to testimony concerning Appellant's receipt of the Carnegie Award and testimony about his history of nonviolence as related by Appellant's mother. As a result, counsels' decision not to present evidence concerning Appellant's austere background was grounded in a reasonable strategy designed to effectuate Appellant's interest.[27] Similarly, regarding Appel-

27. Regarding Appellant's argument that counsel was ineffective for failing to obtain the investigative report completed by the Carnegie Hero Fund, the only new evidence that counsel would have discovered from this report is that Appellant had bad grades in school. This

lant's assertions that counsel should have uncovered evidence that he was abused as a child, such evidence would not have fit into counsel's strategy of portraying Appellant as a heroic, nonviolent individual.[28] Appellant, therefore, has not proven the lack of a reasonable basis prong of the test for ineffectiveness with regard to life history mitigation. *See Pierce*, 527 A.2d at 975. *See also Bracey*, 568 Pa. 264, 795 A.2d 935; *Commonwealth v. Basemore*, 744 A.2d at 735 (holding that counsel cannot be found ineffective for failing to pursue a particular mitigating factor where, despite a reasonable investigation by counsel, counsel was not put on notice of any such mitigating evidence); *Commonwealth v. Peterkin*, 511 Pa. 299, 513 A.2d 373, 383 (1986) (judging the reasonableness of counsel's investigation based on the information supplied by the defendant).[29]

evidence would not have fit into the mitigation evidence counsel reasonably decided to present.

28. Appellant makes much of the fact that counsel failed to uncover evidence of childhood abuse. Counsel, however, had no reason to believe that Appellant was abused. N.T. PCRA at 147. Appellant has not established that he ever informed counsel of this alleged childhood abuse or that counsel had any notice whatsoever of this alleged childhood abuse after having spoken at various times with not only Appellant but also his family and friends. *See Commonwealth v. Hall*, 582 Pa. 526, 872 A.2d 1177, 1188 n. 9 (2005) (where neither the appellant nor his family informed counsel about alleged childhood abuse, the appellant failed to establish his claim of ineffectiveness); *Commonwealth v. Miller*, 560 Pa. 500, 746 A.2d 592 (2000) ("Because appellant and his family failed to reveal the extent of abuse in the family home, counsel cannot be ineffective for failing to present evidence of the pervasive abuse at appellant's trial.").

29. In his dissenting opinion, Justice Saylor emphasizes Reid's lack of experience and the short time allotted for the mitigation investigation. It appears to be Justice Saylor's position that any mitigation investigation that begins following the guilty verdict is *per se* unreasonable, without regard to whether counsel had a mitigation strategy that resulted in a thoughtful effort to convince the jury to spare Appellant's life. In a general sense, we share Justice Saylor's concern about the lack of time dedicated to investigating mitigation. We do not believe, however, that this factor alone renders counsels' performance unreasonable. In this case, counsel prepared a mitigation case. As described above, there was an investigation: counsel investigated Appellant's family history, talked to Appellant and his family numerous times, and secured the testimony of Appellant's mother and Mr. Stephens. Through this investigation, counsel became aware of Appellant's life

Having concluded that Appellant has not met his burden of proving counsel ineffectiveness with regard to the investigation of life history mitigation, we now turn to his claim that counsel was ineffective for failing to investigate and present mental health mitigation. The PCRA court concluded that this claim fails the arguable merit and reasonable basis prongs of the test for counsel ineffectiveness. *See Pierce,* 527 A.2d at 975. After a careful review, we find that the PCRA court's conclusions in this regard are supported by the record, and agree that Appellant's claim fails because he has not proven the arguable merit or reasonable basis prongs of his claim of ineffectiveness.

Addressing the arguable merit prong first, we note that, as with all claims of ineffectiveness, Appellant has the burden of proving the arguable merit of his claim that counsel were ineffective for failing to investigate and present mental health mitigation has. *Washington,* 927 A.2d at 594. Specifically, Appellant must prove there was discoverable evidence that he was, in fact, mentally impaired before his trial in 1986 and that counsel failed to discover this evidence. *Commonwealth v. Brown,* 582 Pa. 461, 872 A.2d 1139, 1149 (2005) (where there was no discoverable evidence of mental illness, the appellant field to prove the arguable merit of trial counsel's ineffectiveness). If he cannot prove that he actually had mental impairments that counsel failed to discover, he has not carried his burden to prove that his claim of trial counsel ineffectiveness has arguable merit. We find that Appellant has failed to meet his burden regarding the arguable merit prong for several reasons: Appellant presented is no evidence of head injuries; he did not provide the mental health providers' reports, which they purported to attach to their declarations; each of Appellant's mental health providers purported to rely on unidentified background materials; and each provider failed to link

history, but found nothing that should have caused them to investigate further or alter their judgment that evidence of family history and poverty would not fit into their strategy of arguing that Appellant's life deserved to be spared because Appellant had previously saved the life of Mr. Stephens.

their conclusions in 2000 to Appellant's mental status fifteen years before.

First, the only evidence we have that Appellant actually sustained head injuries, which allegedly lead to a deterioration in his mental health, is the unsworn declaration of his sister, Ms. Scott, who stated that when Appellant was thirteen, he hit his head after crashing a bicycle, and was once hit in the head by another individual. Declaration of Ms. Scott, January 1, 2000. There are no medical records reflecting these alleged injuries. Similarly, although Dr. Armstrong refers to ten years of pugilistic sports related head injuries in prison, there is no medical evidence regarding these alleged injuries. Further, as the PCRA court found, the declarations of Drs. Armstrong, Woods, and Dee are not persuasive. Preliminarily, although Appellant refers to each of his mental health providers' declarations as affidavits, the declarations of Drs. Armstrong and Woods cannot properly be characterized as such, because they have not been sworn to by the declarant before an officer authorized to administer oaths. *See* 1 Pa. C.S. § 1991 ("Affidavit" is defined as "[a] statement in writing of a fact or facts signed by the party making it, sworn to or affirmed before an officer authorized by the laws of this Commonwealth to take acknowledgments of deeds, or authorized to administer oaths, or before the particular officer or individual designated by law as the one before whom it is to or may be taken, and officially certified to in the case of an officer under his seal of office."). *See Hall,* 872 A.2d at 1188 (Pa.2005) (declining to characterize as affidavits documents that have not been sworn to by the declarant in accord with 1 Pa.C.S. § 1991). It is questionable whether such unsworn declarations are sufficient to sustain Appellant's burden. *See Commonwealth v. Dennis,* 950 A.2d 945, 975 (Pa.2008) ("it appears that such a document [an unsworn declaration] standing alone would be insufficient to prove ineffectiveness). In contrast, the letter by Dr. Henry Dee appears to qualify as an affidavit because it was signed and notarized by a Pennsylvania public notary.

Putting these concerns aside and assuming the truth of the assertions contained in the declarations and Dr. Dee's affidavit, the assertions are substantively flawed. Although each mental health provider referred to their reliance on "numerous background materials" regarding Appellant, they did not identify or list these materials. Additionally, Dr. Armstrong asserts that she conducted a forensic neuropsychological assessment of Appellant at the request of PCRA counsel, and attached the results of this neuropsychological evaluation to her declaration. Appellant, however, does not set forth the contents of that report nor does he offer a copy thereof.[30] We are left with Dr. Armstrong's conclusions, which appear to be based solely on Appellant's family's unsworn declarations and unidentified background materials. Further, although Dr. Armstrong's 2000 declaration is in the present tense when describing Appellant's inability to engage in multiple cognitive processes simultaneously and the impairment to his judgment and reasoning, which she ties to head trauma resulting from pugilistic sports activity in prison, she does not reference when these injuries occurred in relation to the 1985 murders.

Dr. Woods' declaration suffers from similar concerns. He asserts that he conducted a psychiatric evaluation of Appellant following two interviews of him, a review of "numerous [unidentified] background materials," and after consulting with Dr. Armstrong. Dr. Woods' statement tracks the factual assertions regarding Appellant's childhood found in the unsworn assertions provided by Appellant's family members. He likewise concluded that at the time of the offense Appellant suffered from an extreme mental or emotional disturbance, and had an impaired ability to conform his conduct to the law, without explaining how he was able to reach this conclusion in 2000 about Appellant's 1985 mental status. Similarly, Dr. Dee performed a "psychological and neuropsychological test battery" on Appellant, reviewed numerous, unspecified documents regarding him generally, his background, and the trial proceedings. In Dr. Dee's opinion, Appellant "is a

---

**30.** Although Appellant purported to provide the PCRA court with the reports of Drs. Armstrong, Woods, and Dee, he did not do so.

seriously psychologically impaired individual and has been so for many years, since well before the offense at issue." Affidavit of Dr. Dee, May 12, 2000. As with the other mental health providers, Dr. Dee does not explain how his 2000 evaluation informed his conclusions of Appellant's mental condition in 1985.

Because of the lack of evidence of head injuries, Appellant's failure to include or set forth the contents of the mental health providers' reports, their reliance on unidentified background materials, and their failure to link their conclusions in 2000 to Appellant's mental condition in 1985, the evidence supports the PCRA court's conclusion that Appellant has failed to prove the arguable merit prong of his ineffectiveness claim with regard to mental health mitigation. *See Washington,* 927 A.2d at 615 (noting that a psychological evaluation conducted seven years following the murder for which the appellant was on trial was unavailable to trial counsel and was based on information not known to counsel at the time of trial); *Blystone,* 725 A.2d at 1207, n. 22 (discounting the opinion of doctors who examined the appellant eleven years after the murder in close proximity to the PCRA hearing because they did not know appellant at the time of the murder or at any time prior to trial). Appellant has offered no other evidence in support of the arguable merit prong of his ineffectiveness claim that counsel should have discovered and presented mental health mitigation to the jury. He does not assert that there was any evidence of his alleged mental impairments in the form of medical, school, or prison records, or any other documentation of his mental health in 1985 that counsel failed to uncover. This case is not one in which there was "a wealth of material available at the time of sentencing that could have led to persuasive evidence of mitigation." *Commonwealth v. Jones,* 590 Pa. 202, 912 A.2d 268, 293 (2006) (affirming the PCRA court's grant of a new penalty phase where trial counsel failed to investigate and uncover a substantial amount of mitigation evidence, including juvenile court, school, and incarceration records that detailed a history of mood swings, auditory and visual hallucinations, and difficulty staying in

touch with reality.) Unlike *Jones,* Appellant does not assert that counsel failed to obtain certain records that would have revealed evidence of Appellant's mental impairments.

We conclude, therefore, that Appellant has failed to prove the arguable merit of his claim of counsel ineffectiveness with regard to the investigation of mental health mitigation. Even assuming the arguable merit of this argument, however, we conclude that the record further supports the PCRA court's conclusions with regard to the second prong of ineffectiveness. With regard to this prong, it is well established that trial counsel has an "obligation to conduct a thorough investigation of the defendant's background." *Commonwealth v. Gorby,* 567 Pa. 370, 787 A.2d 367 at 371–72 (2001); *Williams v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). This obligation includes the duty "to discover all reasonably available mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor." *Commonwealth v. Hughes,* 581 Pa. 274, 865 A.2d 761, 813 (2004) (quoting *Wiggins v. Smith,* 539 U.S. 510, 524, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003)). "[O]ur principal concern in deciding whether [counsel] exercised 'reasonable professional judgmen[t]' is not whether counsel should have presented a mitigation case. Rather, we focus on whether the investigation supporting counsel's decision not to introduce mitigating evidence of [appellant's] background *was itself reasonable." Commonwealth v. Malloy,* 579 Pa. 425, 856 A.2d 767, 784 (2004) (quoting *Wiggins v. Smith,* 539 U.S. at 522–23, 123 S.Ct. 2527). The reasonableness of a particular investigation depends upon evidence known to counsel, as well as evidence that would cause a reasonable attorney to conduct a further investigation. *See Wiggins,* 539 U.S. at 527, 123 S.Ct. 2527; *Commonwealth v. Rainey,* 593 Pa. 67, 928 A.2d 215, 239 (2007); *Hughes,* 865 A.2d at 813–14. Specifically, counsel's investigation is dependent, in part, upon the information given to counsel by the appellant in the course of his investigation. *Malloy,* 856 A.2d at 788. Counsel's obligations do not require an investigation into "every conceivable line of mitigating

evidence no matter how unlikely the effort would be to assist the defendant at sentencing." *Id.* at 533, 856 A.2d 767.

Appellant has failed to demonstrate that counsels' investigation of mental health mitigation was unreasonable. *See Malloy*, 856 A.2d at 784 (explaining that our focus is on whether the investigation supporting counsel's decision not to introduce mitigating evidence was itself reasonable). Before Appellant's trial, counsel hired Dr. Berkey to conduct a psychiatric evaluation of Appellant in connection with the guilt phase. Dr. Berkey concluded that Appellant had antisocial personality and derived gratification from attention and notoriety and evidenced some grandiose and paranoid tendencies. However, the doctor opined that Appellant's thinking was organized, and he did not seem psychotic or in any way incompetent. Based on Dr. Berkey's opinion, counsel reasonably could have concluded that there was no basis to investigate Appellant's mental health as a possible source of mitigation. Although Appellant claims that counsel was ineffective for failing to provide Dr. Berkey with certain background materials and for failing to request an evaluation specifically for purposes of mitigation, the only evidence Appellant points to in support of this proposition is that Attorney Tershel could not recall hiring or consulting with Dr. Berkey. As the PCRA court found, however, Attorney Lieker conducted much of the investigation into Appellant's mental health, and hired Dr. Berkey for the purpose of having Appellant psychologically evaluated. Further, although Appellant asserts that counsel failed to provide Dr. Berkey with certain background materials, Appellant does not identify these materials or indicate what they would have revealed.

Moreover, looking past Dr. Berkey's report, there is nothing in the record or Appellant's argument that indicates that counsel's investigation was unreasonable. There is no evidence that counsel knew or should have known about Appellant's cognitive difficulties, or that Appellant or anyone else indicated to counsel that Appellant had mental impairments or head injuries that could have led to cognitive difficulties. Additionally, we have Attorney Tershel's own observations

and interactions with Appellant and his family. Attorney Tershel testified that he spoke to Appellant frequently, N.T. PCRA 84, 194, and had no reason to suspect that he had any potential mental health problems. *Id.* at 127–29. Rather, Appellant appeared competent, coherent, cooperative, was able to communicate effectively, understood what was happening with his case, and gave no indication of mental health issues. *Id.* at 129, 185, 197.[31]

We have been clear that the reasonableness of counsel's mitigation investigation depends in part upon the information supplied by the appellant. *Malloy,* 856 A.2d at 788; *Commonwealth v. Peterkin,* 511 Pa. 299, 513 A.2d 373 (1986). Here, at the time of trial, Appellant did not give any indication to counsel that he had a history of mental illness or head injuries. Where the record at the time of trial indicated that the appellant did not suffer from any mental illness, we have held that the information available to trial counsel did not alert counsel to investigate such issues further. *Commonwealth v. Brown,* 582 Pa. 461, 872 A.2d 1139, 1150 (2005). *See also Bracey,* 795 A.2d at 944 (finding trial counsel was not ineffective for failing to present evidence of alleged abuse where neither defendant nor his family informed counsel of the abuse); *Commonwealth v. Miller,* 560 Pa. 500, 746 A.2d 592, 601 (2000) (same); *Commonwealth v. Uderra,* 550 Pa. 389, 706 A.2d 334, 339–40 (1998) (holding that trial counsel was not ineffective for declining to present mitigation evidence regarding appellant's psychological problems and drug use when appellant failed to disclose any information about those problems prior to trial). Based on this record, Appellant has not demonstrated that trial counsel should have conducted further investigation because the information available to trial counsel did not alert them to investigate further. We will not find counsel ineffective for failing to produce mitigating evi-

31. To the extent that Appellant faults counsel for not contacting Ms. Romaine to ask whether, in her opinion, Appellant had cognitive difficulties, the record indicates that counsel did contact Ms. Romaine. Attorney Tershel asked Ms. Romaine's opinion as to whether Appellant would make a good witness. Ms. Romaine responded in the affirmative, and added nothing which might have alerted counsel to explore further Appellant's mental health.

dence relative to an alleged mental infirmity when counsel had no reason to suspect that the defendant might have such an infirmity. *Washington,* 927 A.2d at 616; *Rollins,* 738 A.2d at 448; *Commonwealth v. Howard,* 553 Pa. 266, 719 A.2d 233, 238 (1998); *Uderra,* 706 A.2d at 339–40. Because counsels' investigation was reasonable, Appellant has not met the second prong of proving ineffectiveness. *See Pierce,* 567 Pa. 186, 786 A.2d 203, 213.

## XII. Ineffectiveness Relating to "Good Conduct" in Prison

██ Appellant asserts that evidence tending to show the he was a well-behaved and well-adjusted prisoner, from which the jury could draw favorable inferences regarding Appellant's character and future conduct as a prisoner, if sentenced to life in prison, is admissible mitigating evidence, and trial counsel was ineffective for failing to present such evidence to the jury. *See Skipper v. South Carolina,* 476 U.S. 1, 4, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986) (holding that evidence that a petitioner has been a well-behaved and well-adjusted prisoner from which the jury could draw favorable inferences regarding the petitioner's character and probable future conduct if sentenced to life in prison is admissible as mitigating evidence).

Specifically, Appellant alleges counsel ineffectiveness for failing to investigate, develop, and present evidence regarding four instances of good conduct in prison. First, after years of incarceration, Appellant had established that he was able to reside in prison with no instances of misconduct. He asserts that counsel could have discovered this fact by simply calling the Department of Corrections (DOC) and requesting Appellant's records. *See Hall v. Washington,* 106 F.3d 742, 752 (7th Cir.1997) (holding trial counsel ineffective for failing to investigate and present evidence of the appellant's good conduct in prison). Second, Appellant helped save the life of a fellow inmate who had tried to hang himself. He claims this evidence was available from the Washington County jail. Third, Appellant assisted the FBI in its investigation of another inmate, Samuel Wallace. Finally, Appellant asserts that he

saved the lives of two women while in prison. When an inmate named Robert McGrogan approached Appellant and offered him $1500 if Appellant would kill two women, Mary and Donna Hoegrel, Appellant telephoned one of the women and told her of McGrogan's intentions and later assisted the Commonwealth in McGrogan's prosecution by testifying at his preliminary hearing. *See Commonwealth v. McGrogan*, 367 Pa.Super. 394, 532 A.2d 1203 (1987). Appellant asserts that evidence of his role in McGrogan's prosecution was readily available to counsel because McGrogan's trial took place before Appellant's trial.[32]

Appellant asserts that there could be no reasonable basis for failing to uncover this evidence, because trial counsel clearly thought that evidence that Appellant saved someone's life was useful, as that was the focus of counsels' penalty phase presentation. Appellant further claims that he was prejudiced by these failures, because evidence that he was a model prisoner, an aid to law enforcement, had assisted corrections officers in aiding another inmate, and had saved the lives of two women would have shown the jury that he posed no threat to society while in prison. This evidence, he asserts, would have deflated the argument made by the prosecution that although Appellant had saved the life of Mr. Stephens when he was young, the personality trait leading to this action had not endured.

The PCRA court rejected Appellant's four instances of good conduct as adequate to prove counsel ineffectiveness. First, the PCRA court found no arguable merit to Appellant's assertion that counsel was ineffective for failing to offer evidence of Appellant's lack of prison misconduct. The PCRA court noted that there was some question concerning Appellant's behavior while incarcerated. Specifically, the PCRA testimony revealed that Appellant had appeared in court on preliminary matters clothed in a towel, and had created problems while incarcerated. Additionally, the PCRA court concluded that trial counsel reasonably decided not to introduce evidence of

**32.** McGrogan approached Appellant in jail before Appellant was released and killed the three victims in June, 1985.

Appellant's good conduct while incarcerated because, as Attorney Tershel testified, it would not have benefited Appellant to have the jury hear of his long history of incarceration.

Second, the PCRA court noted that Appellant and the FBI agent involved in the investigation of Mr. Wallace testified during the guilt phase concerning Appellant's role in the investigation, and found that counsel reasonably chose "not to rehash the evidence concerning [Appellant's] assistance with the FBI at the sentencing phase given that this evidence was introduced in the guilt phase." PCRA Ct. Op. at 50. Third, the PCRA court concluded that there was no arguable merit to the claim that counsel were ineffective for failing to introduce evidence of Appellant's role in saving the life of another inmate, because Appellant did not make counsel aware of this event. PCRA Ct. Op. at 51; N.T. PCRA at 199. Finally, regarding Appellant's role in saving the lives of the two women, the PCRA court found that although this claim had arguable merit, counsel was not unreasonable in failing to introduce this evidence because Attorney Tershel did not find out about it until after the completion of the penalty phase of Appellant's trial.

We will address separately each piece of evidence that Appellant argues counsel should have obtained and presented to the jury. First, regarding Appellant's assertion that he had no instances of misconduct while in prison, he claims that counsel would have discovered this evidence if counsel had obtained Appellant's DOC records, which were readily available. Appellant bears the burden of proving his ineffectiveness claim. *See Cooper*, 941 A.2d at 664. This burden necessarily includes his obligation to prove that the records he faults counsel for not obtaining actually existed and were available to counsel. Appellant, however, did not provide his DOC records to the PCRA court. The PCRA court, therefore, had no way to evaluate them to determine whether they, in fact, contained the information Appellant claimed was within them. Without the records before it, neither the PCRA court nor this Court has any way of verifying that the records exist or that, if they do, they contain the information Appellant

claims. The record here contains only Appellant's bald assertions that his DOC records would have supported his argument. Appellant's claims, however, are not self proving; his failure to demonstrate that the DOC records actually existed and were substantively consistent with his representations is fatal to his argument.[33] *See Commonwealth v. Busanet*, 572 Pa. 535, 817 A.2d 1060, 1070 (2002) (Appellant bears the burden of demonstrating that relevant evidence actually existed); *Commonwealth v. Smith*, 544 Pa. 219, 675 A.2d 1221, 1234 (1996) (Opinion Announcing Judgment of Court) ("[T]rial counsel is not ineffective for failing to submit evidence of mitigation where no such evidence exists."); *Commonwealth v. Buehl*, 510 Pa. 363, 508 A.2d 1167, 1177 (1986) ("Counsel could only present that which exists."). Moreover, while Appellant was awaiting trial, he was uncooperative in jail, resisted following directions, and threatened corrections officers with karate, thus providing support for the PCRA court's conclusion that Appellant failed to prove counsel ineffectiveness for not offering as mitigation Appellant's lack of prison misconduct. *See* N.T. PCRA at 188, 190–91. PCRA Ct. Op. at 50.

Next, we address Appellant's assertion that he helped to save the life of an inmate who had tried to commit suicide in prison, and that counsel was ineffective for failing to investigate and present this evidence to the jury. In support of this contention, Appellant presented a Washington County jail incident report that describes that when two corrections officers investigated a noise, they saw an inmate on the floor, and Appellant helped the officer hold the inmate down while he kicked and convulsed. They discovered a shoestring around the inmate's neck. Appellant has not demonstrated that he

33. The only specific reference to DOC records before our Court is in the declaration of Dr. Woods, who claims to have reviewed, in 2000, "volumes of DOC records that document [Appellant's] life." Declaration of Dr. Woods, May 15, 2000. It is insufficient to forgo submitting the records that purportedly contain mitigation evidence in favor of relying on an assertion in a declaration that merely implies that such records exist. Further, Dr. Woods did not indicate the time frame these records encompassed, and given that Dr. Woods' evaluation was in 2000, it is entirely likely that his review included DOC records created after Appellant's sentence in 1986.

was prejudiced by counsel's failure to present this evidence. In addition to proving arguable merit and a lack of reasonable strategic basis for counsels' actions, Appellant must prove that he was prejudiced by counsel's conduct. *See Pierce*, 527 A.2d at 975. Evidence that Appellant helped corrections officers attend an inmate who had attempted suicide would be mitigating evidence under the catch-all mitigator. *See* 42 Pa.C.S. 9711(e)(8). As noted, however, the jury found the existence of this mitigator in reliance on counsel's argument that Appellant had saved the life of Mr. Stephens. While this additional evidence would have bolstered counsel's portrayal of Appellant as heroic, in light of the gruesome nature of the crime and the jury's acceptance of the Commonwealth's aggravating factors, we cannot conclude that it would have persuaded at least one juror to give more weight to the already found catch-all mitigator, such that the juror would have held out for life in prison. The burden on Appellant is to prove sufficient prejudice—*i.e.*, a reasonable probability that the outcome of trial would have been different had counsel presented this additional evidence to the jury. *See Wiggins*, 539 U.S. at 537, 123 S.Ct. 2527 (articulating the prevailing standard for assessing prejudice from deficient stewardship in the presentation of mitigation evidence in terms of whether "there is a reasonable probability that at least one juror would have struck a different balance."). He has not done so. *See Rios*, 920 A.2d at 812–13 (rejecting the appellant's ineffectiveness claim grounded in counsel's failure to provide more evidence in support of a mitigating circumstance found by the jury); *Commonwealth v. Scott*, 561 Pa. 617, 752 A.2d 871, 877 n. 7 (2000) (where the jury found the "catch-all" mitigating circumstance, the appellant failed to show that he suffered any prejudice from his counsel's failure to introduce more evidence in support of this mitigator).[34]

34. It is also noteworthy that there is evidence on the record that counsel was actually aware of Appellant's role following the inmate's suicide attempt. Mr. Reid testified that he was instructed, presumably by counsel, to talk to a corrections officer at the Allegheny County courthouse who had witnessed an incident where Appellant saved the life of an individual, see N.T. PCRA at 28, and later referred to this incident as one involving an inmate's suicide attempt, see N.T. PCRA at

Next, we examine Appellant's allegation that counsel was ineffective for failing to explain to the jury that it could consider evidence of Appellant's role in the FBI's investigation of Mr. Wallace or request a jury instruction in this regard. Even assuming this claim has arguable merit, we find that Appellant has failed to prove that he was prejudiced by counsel's failure. *See Pierce*, 786 A.2d at 213. The jury was already aware of Appellant's role in the investigation because the FBI agent testified in the guilt phase. Although trial counsel did not remind the jury of this fact during closing or request a jury instruction regarding it, we find that because the jury had just heard this evidence there is not a reasonable probability that but for counsel's error, the outcome of the proceeding would have been different. *Cox*, 863 A.2d at 546.

Finally, we turn to Appellant's contentions that he notified Mary and Donna Hoegrel of Mr. McGrogan's attempt to hire Appellant to kill them. Appellant claims that trial counsel should have presented the Hoegrels to testify at Appellant's penalty phase hearing, or presented evidence of Appellants' effort to save them. Before counsel can be found to be ineffective for failing to uncover substantial mitigation evidence, Appellant must demonstrate that such evidence exists. *Busanet*, 817 A.2d at 1070. It appears that there are several possible sources of this evidence: the Hoegrels themselves, Appellant's DOC records, the Superior Court opinion in Mr. McGrogan's appeal, *see McGrogan*, 367 Pa.Super. 394, 532 A.2d 1203, which discusses Appellant's role in the McGrogan investigation and preliminary hearing, and Appellant, who obviously was aware of his role in this incident.

To prove the arguable merit prong of Appellant's claim of counsel ineffectiveness for failing to call the Hoegrels as witnesses in the penalty phase, *see Pierce*, 786 A.2d at 213, Appellant must demonstrate that: (1) the witnesses existed; (2) such witnesses were available to testify for the defense; (3) counsel knew of, or should have known of, the existence of the witnesses; (4) the witnesses were willing to testify for the

46. Mr. Reid obtained this individual's statement and passed it on to counsel. N.T. PCRA at 29.

defense; and (5) the absence of the testimony of such witnesses was so prejudicial as to have denied the petitioner a fair trial. *See Commonwealth v. Fletcher*, 561 Pa. 266, 750 A.2d 261, 292 (2000). Appellant has not attempted to prove any of these factors; thus, we cannot conclude counsel was ineffective for failing to call these witnesses. Regarding Appellant's DOC records as a possible source of information regarding Appellant's role in Mr. McGrogan's prosecution, as noted, Appellant has not provided these records to the PCRA court or this Court, so they cannot form a basis of a finding of ineffectiveness. *Busanet*, 817 A.2d at 1070. Nor was the Superior Court opinion describing Appellant's notification of the Hoegrels and his testimony against Mr. McGrogan available to counsel during the penalty phase because it was filed October 21, 1987, after the completion of Appellant's trial. That leaves us to consider Appellant himself as a source of this information. Appellant, however, does not argue that he told counsel of his involvement, was ready and willing to testify about his involvement at the penalty phase, or that there was any reason for counsel to be aware of and ask him about it. Therefore, Appellant has not proven the arguable merit prong of his claim of counsel ineffectiveness because he has not demonstrated that the evidence existed or was available to counsel.

### XIII. Jury Instructions Regarding Mitigating Circumstances

 Appellant next argues that the penalty phase jury instructions erroneously suggested that the jury must unanimously find a mitigating circumstance, in violation of *Mills v. Maryland*, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988). As we recently explained in *Commonwealth v. Duffey*, 585 Pa. 493, 889 A.2d 56, 71 (2005) and *Cox*, 863 A.2d at 554, "an alleged *Mills* violation will not be available on collateral review in cases in which the alleged error occurred before the United States Supreme Court's decision in *Mills*." In this case, the allegedly erroneous instruction was given in 1986, before the Court's 1988 decision in *Mills*. Appellant never raised or preserved a *Mills* claim before the trial court or on

direct appeal. As such, Appellant's claim regarding *Mills* is waived. *Duffey, Cox, supra.*

Like the appellants in *Duffey* and *Cox*, Appellant attempts to overcome waiver by asserting that all prior counsel were ineffective for failing to preserve and raise this issue. He does not, however, attempt to develop this aspect of his argument. In any event, we will not deem trial counsel ineffective for failing to anticipate a change in the law. *Duffey*, 889 A.2d at 71. Accordingly, trial counsel was not ineffective for failing to anticipate the *Mills* decision, and Appellant's claim of ineffectiveness necessarily fails.

## XIV. Victim Impact Evidence

Victim impact evidence, which is "evidence concerning the victim and the impact that the death of the victim has had on the family of the victim. . . ." 42 Pa.C.S. § 9711(a)(2), was inadmissible before December 11, 1995. *See Commonwealth v. Romero*, 595 Pa. 275, 938 A.2d 362, 379 (2007); *Commonwealth v. Fisher*, 545 Pa. 233, 681 A.2d 130, 145–47 (1996). *See also Commonwealth v. McNeil*, 545 Pa. 42, 679 A.2d 1253, 1259 (1996). Thus, at the time of Appellant's trial, victim impact testimony was completely barred from criminal proceedings. *See Rios*, 920 A.2d at 806–07. Appellant argues that unlawful victim impact evidence was presented at his trial in three ways: the testimony of Ms. Delilah Paul; the prosecution's penalty phase closing argument; and trial counsel's penalty phase closing argument. Appellant asserts that trial counsel's failure to object to the evidence, as well as counsel's own argument, constitutes ineffective assistance of counsel.

Ms. Paul was a ninety-year old friend of one of the victims, and testified that the victims attended a luncheon she organized on behalf of the "Child Welfare Club." Appellant acknowledges that the legitimate purpose of this testimony was to narrow the time of death. Brief for Appellant at 90. As the PCRA court found, Ms. Paul's testimony established that the luncheon was held on June 21, 1985, and began at 12:30 p.m. She established that the meal was served around 1:00, and that all three victims were present for the meal. We

agree with the PCRA court that this evidence was introduced to narrow the time of death and was not "evidence concerning the victim and the impact that the death of the victim has had on the family of the victim . . . ." 42 Pa.C.S. § 9711(a)(2). *See also Romero*, 938 A.2d at 379. Therefore, Appellant cannot prove the arguable merit of his argument that counsel was ineffective for failing to object.

In his closing argument during the penalty phase, the prosecutor highlighted the testimony of Ms. Paul to illustrate that the victims were active, viable people in the community:

I would like to talk to you a little bit about the victims in this case. We know their ages and we know that they were still active, viable people in this community and that probably can best be drawn back in your minds to the testimony of Mrs. Paul who proudly stated that she's 90 years old and she's the one that arranged all of this; that luncheon . . . that day . . . the first day of summer . . . the last day of these ladies' lives.

These ladies lived by themselves and the oldest of the three was the one that drove her car that day. So, these ladies were active, productive members of the community and of society and had every right to live out their golden years and to die of natural causes.

N.T. 1565–66. Again, trial counsel did not object. The PCRA court found that Appellant had failed to prove counsel was ineffective because he was not prejudiced by this argument. We agree that the evidence supports this finding. Specifically, the prosecutor's characterization of the victims in the closing argument represents a brief section of the closing argument, which spans a total of ten pages. While we take no position on the appropriateness of the characterization of the victims' role in the community, we conclude that it was fleeting when viewed in the context of the entire closing argument. *See Commonwealth v. May*, 587 Pa. 184, 898 A.2d 559, 567–68 (2006) (finding no prejudice resulted from testimony that was fleeting when viewed in the context of a trial that consisted of more than one-thousand pages of testimony). The prosecutor's remark, if prejudicial at all, was not "so severe as to

prejudice the jury to the point that it could not render a true and fair verdict." *Id.See also Commonwealth v. Robinson,* 583 Pa. 358, 877 A.2d 433, 443–44 (2005) (finding that the appellant was not prejudiced by the prosecutor's reference to the victim's religion because the comment was so brief it did not affect the jury's decision); *Commonwealth v. Freeman,* 573 Pa. 532, 827 A.2d 385, 414 (2003) (holding that brief, non-specific testimony that, prior to her murder, the victim was "peaceful" and "nice" was so fleeting and general, it was not prejudicial); *Commonwealth v. Rollins,* 558 Pa. 532, 738 A.2d 435, 447 (1999) (finding brief testimony that a boy was afraid of guns as result of witnessing the crime did not prejudice the appellant). Because Appellant fails to prove prejudice, his claim of trial counsel's ineffectiveness fails.

Although Appellant refers to a comment by trial counsel in closing that he characterizes as victim impact evidence, he does not identify the comment or develop his argument in this regard. Therefore, we cannot consider this vague reference as sufficient development of his claim. *See Bracey, supra; Commonwealth v. Natividad,* 595 Pa. 188, 938 A.2d 310, 324 (2007).

## XV. Instruction Regarding the Torture Aggravator

The trial court instructed the jury that it was permitted to consider whether the offenses in question were committed by means of torture:

Torture is the infliction of a considerable amount of pain and suffering on a victim which is unnecessarily heinous, atrocious or cruel manifesting exceptional depravity. It must be shown beyond a reasonable doubt that the defendant intended to torture his victims to death and the actual commission of the offenses included such concurrent acts as to set the crime apart from the norm of capital felonies, that is the conscientiousness or the pitiless crime which is unnecessarily painful to the victim or victims.

N.T. at 1574. Appellant asserts that this instruction was unconstitutionally vague and overbroad, and that counsel was ineffective for failing to object and for failing to raise this

issue on appeal. The PCRA court found that counsel did raise this issue on direct appeal, and this Court addressed it, concluding that the claim is previously litigated.

On direct appeal, this Court did indeed consider whether the trial court erred in submitting the question of torture to the jury and whether the jury's finding of torture was supported by the evidence. *Steele,* 559 A.2d at 913. In analyzing these issues, we reviewed the charge to the jury and concluded as follows:

> Moreover the record reflects that the trial court properly charged the jury, by defining torture as the infliction of a considerable amount of pain and by stating that it must be shown beyond a reasonable doubt that the defendant intended to torture his victims to death. There is a presumption in the law that the jury followed the instructions given by the trial judge and thus, properly found that the appellant did intend to torture the victims. *Commonwealth v. Stoltzfus,* 462 Pa. 43, 55, 337 A.2d 873, 879 (1975) (We will not presume that the jurors disregarded their duty and the instructions of the Court); *Dauphin v. Standard Oil Company,* 312 Pa. 229, 232, 167 A. 287, 288 (1933) (The presumption is that the jury complied with the court's instructions).

*Id.* Therefore, because the question of the trial court's charge to the jury regarding the torture aggravator was previously litigated and rejected, Appellant cannot satisfy the arguable merit prong of *Pierce* with regard to counsel's ineffectiveness. *See Commonwealth v. Dennis,* 597 Pa. 159, 950 A.2d 945 (2008).

## XVI. Ineffectiveness of Counsel

Next, Appellant argues that "all prior counsels' failures properly to investigate and present each and all of the issues presented in Appellant's PCRA proceedings and in this appeal were ineffective." Brief for Appellant at 98. In baldly asserting the ineffectiveness of prior counsel, Appellant has failed to develop this claim in any meaningful fashion. Therefore, Appellant's boilerplate argument respecting the ineffectiveness of prior counsel is insufficient to establish an entitlement

to post-conviction relief. *See Rainey,* 928 A.2d at 244–45; *Commonwealth v. Spotz,* 587 Pa. 1, 896 A.2d 1191, 1250 (2006); *Commonwealth v. Bond,* 572 Pa. 588, 819 A.2d 33, 41 (2002) (noting that a boilerplate allegation that all prior counsel were ineffective for failing to litigate waived issues does not discharge the appellant's burden of proving ineffectiveness); *Bracey,* 795 A.2d at 940, n. 4; *Commonwealth v. Abdul–Salaam,* 570 Pa. 79, 808 A.2d 558, 560 n. 3 (2001).

## XVII. Cumulative Effect of Errors

■■■ Finally, Appellant contends that he is entitled to relief because the cumulative effect of the errors he asserts denied him a fair trial. We have long held that "no number of failed claims may collectively warrant relief if they fail to do so individually." *Natividad,* 938 A.2d at 340–41; *Rainey,* 928 A.2d at 245; *Commonwealth v. (James) Williams,* 586 Pa. 553, 896 A.2d 523, 548 (2006), *cert. denied,* 549 U.S. 1213, 127 S.Ct. 1253, 167 L.Ed.2d 88 (2007); *Blystone,* 725 A.2d at 1208–09; *Commonwealth v. (Craig) Williams,* 532 Pa. 265, 615 A.2d 716, 722 (1992).

Accordingly, the order of the PCRA court is affirmed.[35]

Justice GREENSPAN did not participate in the consideration or decision of this case.

Justice EAKIN, Justice TODD and Justice McCAFFERY join the opinion.

Chief Justice CASTILLE files a concurring opinion in which Justice McCAFFERY joins.

Justice SAYLOR files a dissenting opinion.

Chief Justice CASTILLE, concurring.

I join the learned Majority Opinion, but write to two points of elaboration and to address an issue raised by Mr. Justice Saylor's Dissenting Opinion, regarding whether it would be

---

**35.** The Prothonotary of the Supreme Court is directed to transmit the complete record of this case to the Governor pursuant to *42 Pa.C.S. § 9711(i)*

appropriate to *sua sponte* remove present counsel for perceived briefing deficiencies.

First, to the Majority's analysis of appellant's claims, I would add that this Court recognizes that appellant's ineffectiveness claims are posed under the Sixth Amendment, and thus, the governing standard is *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). "To secure relief under *Strickland,* a defendant must plead and prove both that his 'counsel's performance was deficient' and that the 'deficient performance prejudiced the defense.'" *Commonwealth v. Reaves,* 592 Pa. 134, 923 A.2d 1119, 1127 (2007), quoting *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052.

While the Majority does acknowledge *Strickland,* the Majority also speaks of the defense burden "[i]n Pennsylvania." Majority Op. at 360, 961 A.2d at 796. I would emphasize that the three-pronged Pennsylvania approach is not a distinct or weaker test for counsel ineffectiveness, but merely a more focused manner of applying the governing two-part *Strickland* test. "'It is settled that the test for counsel ineffectiveness is the same under both the Pennsylvania and Federal Constitutions: it is the performance and prejudice test set forth in *Strickland v. Washington . . . .*'" *Commonwealth v. Williams,* 594 Pa. 366, 936 A.2d 12, 19 (2007), quoting *Commonwealth v. Gribble,* 580 Pa. 647, 863 A.2d 455, 460 (2004) (collecting cases). *Accord Commonwealth v. Washington,* 592 Pa. 698, 927 A.2d 586, 594 n. 8 (2007); *Commonwealth v. Hawkins,* 586 Pa. 366, 894 A.2d 716, 721 n. 10 (2006). "This Court has consistently applied the [*Strickland*] performance prong by examining both the arguable merit of the claim lodged against counsel in addition to the objective reasonableness of the actions taken by counsel." *Williams,* 936 A.2d at 19 (citation omitted). Appellant's failure to include within his claims of ineffectiveness non-boilerplate argument relevant to the *Strickland* performance and prejudice test requires their rejection.

Second, both the Majority Opinion and Justice Saylor's Dissenting Opinion discuss *Commonwealth v. Albrecht,* 554 Pa. 31, 720 A.2d 693, 700 (1998). *Albrecht* abrogated the discretionary relaxed waiver doctrine on PCRA review be-

cause, among its other jurisprudential failings, relaxed waiver was squarely inconsistent with the PCRA waiver provision. I have elsewhere addressed at length the effect of *Albrecht,* including whether it could accurately be described as "clarifying" relaxed waiver and whether it could rightly be applied "retroactively" to a PCRA petition filed before the abrogation occurred and which relied upon the doctrine. *See Commonwealth v. Bracey,* 568 Pa. 264, 795 A.2d 935, 948–57 (2001) (Castille, J., concurring); *see also Commonwealth v. Ford,* 570 Pa. 378, 809 A.2d 325, 346 n. 8 (2002) (Castille, J., dissenting), *cert. denied,* 540 U.S. 1150, 124 S.Ct. 1144, 157 L.Ed.2d 1044 (2004). *Albrecht* was decided before appellant filed the amended PCRA petition which is the subject of this appeal, and appellant does not challenge its legitimacy or reach. Thus, it poses no retroactivity issue, and, indeed, no *Albrecht* issue is raised.

Turning to Mr. Justice Saylor's Dissenting Opinion, although my esteemed colleague does not agree with the Court's assessment of the adequacy of appellant's briefing in this case and the resultant waiver of claims, he suggests that, given our findings of waiver, *sua sponte* removal of counsel and remand for appointment of new PCRA counsel is warranted. Dissenting Op. at 430–31, 961 A.2d at 839. For purposes of responsive discussion, I will assume that, in an appropriate case, this Court properly may remove PCRA appeal counsel *sua sponte,* that we may do so without allowing counsel to be heard, and that no finding of *Strickland*-type prejudice is required.[1] I agree with the Majority's findings of waiver. In my view, however, on the record here, the fact that counsel has chosen not to develop appellant's claims of ineffective assistance in a fashion designed to ensure merits review under *Strickland* does not support the *sua sponte* removal of counsel.

Appointed counsel of record on appeal is Noah Geary, Esquire, who hails from Washington County, the County

[1]. I do note, however, that it is not self-evident why (1) counsel should not be heard before removal; and (2) counsel should be replaced, and the PCRA appeal expense doubled, rather than be ordered to file a conforming brief.

where the murders occurred and appellant was tried and convicted. Mr. Geary has filed a 98–page Initial Brief, a 9–page Reply Brief to the Commonwealth's cursory (and distinctly unhelpful) Brief for Appellee, and a thick Appendix of Exhibits. From the record, it is apparent that appellant and his appointed counsel have proceeded with the additional substantial assistance of what is now the Defender Association of Philadelphia's specialized unit dedicated to capital litigation.

Appellant's modest, initial *"pro se"* PCRA petition was filed in 1996 with the volunteer assistance of Billy Nolas, Esquire, who at that time was litigation director of the Pennsylvania Post–Conviction Defender Organization (PPCDO). Along with that filing, Attorney Nolas offered that his organization would be willing to represent appellant if it were appointed to do so by the trial court. *See* Nolas Letter to Washington County Clerk of Court, 6/5/96. The following year, on May 15, 1997, Nolas and co-counsel Robert Dunham, Esquire, who were then associated with a successor Pennsylvania capital defense organization with the moniker Center for Legal Education and Defense Assistance (CLEADA), renewed the request to be appointed to represent appellant. In an opinion dated June 6, 1997, the PCRA judge denied the request, noting that appellant was not entitled to appointed counsel of his choice, and that competent PCRA defense counsel was available for appointment in the county. The court appointed a local attorney to represent appellant; the initial appointed PCRA counsel was permitted to withdraw, however, and the court then appointed Peter K. Darragh, Esquire.

Meanwhile, the Defender Association of Philadelphia, Federal Division, absorbed many of the lawyers who had comprised CLEADA, including Attorneys Nolas and Dunham, and also assumed and expanded the capital defense assistance function which had been engaged in by the PPCDO and CLEADA.[2] The lawyers who served in these successive

2. According to a recent article in The Legal Intelligencer, the size of the Federal Defender's capital habeas unit has ballooned from three lawyers in 1996 to "to 36 lawyers and an overall staff of 83" today.

organizations continued working on appellant's case on a voluntary basis, with the approval of Attorney Darragh. Thus, in 1999, Darragh secured a continuance because the Defender Association of Philadelphia was assisting him in researching and preparing appellant's amended PCRA petition. On January 10, 2000, Darragh ultimately filed the 95–page, nineteen claim amended PCRA petition which is the subject of this appeal.

After the Commonwealth responded to the amended petition, the Court scheduled a PCRA hearing for May 30, 2000. At the outset of that hearing, the court recited the history of the case, including its approval of the Philadelphia Federal Defender's voluntary assistance to appointed counsel, which had led the court to grant a continuance. Also on that day, Attorneys Nolas and Anne Saunders, of what was now styled the Federal Defender Capital Habeas Unit, formally entered their appearances as voluntary counsel for appellant. The PCRA hearing was held that same day, and Defenders Nolas and Saunders conducted all defense examinations of witnesses.

After the hearing, and while the PCRA petition was still pending, Darragh was granted permission to withdraw and Attorney Geary was appointed. With the exception of the *Atkins* claim, the Brief filed by Geary in this Court tracks the amended PCRA petition which the Federal Defender had helped to prepare. In addition, the Brief is very familiar in format, style and substance: it reads very much like the briefs the Federal Defender files in capital PCRA cases where it is counsel of record.

In assessing counsel's Brief, I would consider the background summarized above. Counsel has filed substantial pleadings, and the PCRA litigation strategy employed throughout was arrived at with the benefit of consultation with the Federal Defender. The Federal Defenders are well-financed, sophisticated and capable capital defense advocates. They well know—better than this Court knows—the effect that their state-side litigation advice and decisions will have

Shannon P. Duffy, *Skipper is New Chief Federal Defender*, THE LEGAL INTELLIGENCER, Dec. 2, 2008, at 1.

upon the prospect for federal habeas corpus relief. I believe that the structure and content of appellant's petition below, and his Brief in this appeal, are the result of a fully realized capital collateral litigation strategy, one whose primary concern is with laying the groundwork for anticipated federal habeas corpus relief.

This Brief, like other briefs filed by the Federal Defender in the same general time frame, poses the issues in a very distinct and deliberate way. In its statement of the scope and standard of review, in its summary of argument, and in the lengthy preamble to the argument (entitled "Eligibility For Relief And The Nature Of Appellant's Claims"), the Brief is careful to characterize claims in the alternative. Thus, the Brief first declares that appellant is eligible for relief on his "substantive claims of federal constitutional error." In this regard, the Brief says that appellant "seeks substantive review of his claims under the established principles of constitutional law noted in this brief" and cites the direct review harmless error standard. The Brief then asserts, as "additional claims," that the same arguments entitle appellant to relief under the rubric of ineffective assistance of counsel. Finally, the Brief poses, as a third version of the same basic claims, that appellant is entitled to relief under "State Law" and the PCRA, which counsel would have us believe is different than federal law. Initial Brief of Appellant at 1–2, 5–6, 6–11.

A defendant's prospects for federal habeas relief can turn upon the form of a claim. A preserved "constitutional" claim, subject to a direct appeal standard of review (where harmless error would have to be proven beyond a reasonable doubt by the Commonwealth), is preferable to a derivative constitutional claim, such as ineffective assistance of counsel. Under *Strickland*, there is a presumption of competency to overcome, mere error is not enough if counsel acted reasonably, and actual prejudice must be proven by the defense. A defendant with counsel who are savvy to federal habeas standards would make every effort to pose his state collateral claims in a way that maximizes the prospect of securing the more favorable review standard. I believe that it is highly likely that counsel in this case have their federal strategy carefully mapped out,

and that strategy dictated the form of the Brief, including the allocation of space to development of direct review claims versus collateral claims. It is a strategy that may be borne of an anticipation that, if and when appellant proceeds to federal review, he will argue something along the lines of: I posed my PCRA claims as claims of direct constitutional error in state court; I was entitled to do so under relaxed waiver or some other theory; the Pennsylvania Supreme Court's findings of procedural default should not be honored; and my underlying claims therefore should be reviewed, on their merits, without deferring to anything the Pennsylvania state courts had to say. Even with respect to appellant's alternative allegations of counsel ineffectiveness, collateral counsel will probably articulate a theory of why they believe the state defaults this Court has found should be disregarded.

Material briefing deficiencies respecting the *Strickland* versions of appellant's claims are important to this Court, of course, because Pennsylvania law does not permit appellants to pursue waived claims, and *Strickland* claims are not self-proving. But, as I have addressed elsewhere, there is a difference between what this Court has the power to do, given the terms of the PCRA, and the respect our restrained decisions will be shown on federal habeas review. *See Ford,* 809 A.2d at 346 n. 8. State court defendants with an eye toward federal habeas relief have a powerful incentive to seize upon whatever they can to argue that state courts have engaged in unequal treatment, or have unreasonably failed to review the defendant's preferred form of his claims, thereby opening the door for *de novo* federal consideration. And a lower federal court with a predisposition to engaging in non-deferential *de novo* review whenever possible will be receptive to such arguments. This Court has no control over how the federal courts will construe our decisions; we must simply discharge our duties. And, to the extent we would concern ourselves with the coin-flip that is federal habeas review, the result can be very bad law, since every state court response to a particularly egregious, unusual circumstance will be argued, in federal court, as proof that state rules of procedural default are uneven and should not be honored.

For purposes of *sua sponte* assessing the performance of PCRA counsel here, the point is that a capital defendant's collateral litigation incentives do not necessarily dovetail with this Court's limited, authorized review on collateral attack. Appellant's counsel may view compliance with *Strickland* (and the PCRA itself) as a comparative waste of time (and briefing space): the familiar tone and content of the Brief here indicate as much. Counsel may believe that the less that is said about the ineffectiveness claims, the easier it will be to claim in federal court that appellant was not obliged to raise his waived "constitutional" claims here under the derivative guise of *Strickland*. Of course, absent a hearing and counsel's candid testimony, we cannot know counsel's strategy for sure, and counsel may be disinclined to reveal it, particularly where appellant has not sought counsel's removal. What is plainly apparent, however, is that the briefing in this case is not a function of negligence or inattention—it is deliberate and sophisticated, if not entirely candid. And, given the federal court's seeming receptiveness to theories allowing them to ignore Pennsylvania state court procedural defaults in capital cases, it cannot be said that counsel's PCRA briefing strategy is unreasonable. Counsel simply has a different agenda.

Justice McCAFFERY joins this opinion.

Justice SAYLOR, dissenting.

Appellant raises nine claims going specifically to the guilt phase of his trial, which he labels IV through XI and XV. The majority indicates that claims IV, VI, VIII, IX, X, and XI are unreviewable due to a deficient appellate presentation and denies review in part on claims V and VII for the same reason.[1] Only guilt-phase claim XV appears to be treated entirely on its merits.

The majority thus declines to review approximately seventy percent of Appellant's guilt-phase claims, due to the repeated

1. Specifically, the majority focuses on present counsel's failure to develop his arguments in terms of the standard governing claims for

failure on the part of his present attorney to meet requirements for appellate briefing. Appellant's brief, however, was filed in 2003, in a time period in which the requirements for appellate briefing in capital cases were in transition, given that the Court had recently abolished the doctrine of relaxed waiver and was divided concerning the form and degree of development required. Appellant attempts to address such difficulty as follows:

> It is respectfully submitted that this Court's recent opinions regarding pleading and proof in capital PCRA cases are confusing, inconsistent and constantly shifting.[5] Appellant's brief is his attempt to comply with the vacillating requirements of the Court's decisions.

5. *See Commonwealth v. Uderra*, No. 5152–5158, Oct. Term 1991 (Phil. CCP May 24, 2002) (Poserina, J.) at 5 n. 5 (this Court's "recent decisions [on issues of ineffective assistance of counsel] show a fractured court, with no clear majority consensus on these issues"); *Commonwealth v. Jerry Marshall*, 570 Pa. 545, 810 A.2d 1211 (2002) (reviewing merits of claim with "boilerplate" allegations of ineffective assistance); *id.* at 1229–33 (Castille, J.) (lamenting lack of consistent application of pleading rules to such claims); *Commonwealth v. Jerome Marshall*, 571 Pa. 289, 812 A.2d 539 (2002) (declining to review merits of claims with "boilerplate" allegations of ineffective assistance).

Brief for Appellant at 7–8.[2] This introductory comment is followed by a lengthy discussion of the prevailing requirements governing post-conviction review and claims of ineffective assistance of counsel. *See id.* at 6–11. From my perspective, Appellant's brief generally reflects an effort to present claims within an acceptable framework, particularly when assessed against the time frame in which it was filed, and the majority's summary treatment of various arguments is overly stringent.[3]

ineffective assistance of counsel. *See, e.g.*, Majority Opinion at 364–65, 961 A.2d at 799.

2. In various contexts, this Court has acknowledged the difficulties presented in addressing capital litigation. *See, e.g., Commonwealth v. Gibson*, 597 Pa. 402, 421, 951 A.2d 1110, 1121 (2008) ("We recognize that, for some time now, both this Court and the United States Supreme Court have been operating with slim majorities and swing votes in the arena of capital-sentencing ineffectiveness claims.").

3. Indeed, in terms of depth of development, I am unable to distinguish Appellant's treatment of various of his claims from presentations garnering merits review in the recent past.

By way of example, the majority indicates that Appellant failed, in several subparts of his claim of ineffectiveness deriving from expert hair analysis presented by the Commonwealth, to make any mention of prejudice.. *See, e.g.,* Majority Opinion, at 364–65, 961 A.2d at 799–800. However, Appellant described the challenged expert testimony as "sweeping and damaging," Brief for Appellant at 43, and indicated that, "[t]he testimony likely affected the jury's verdicts, as it was the only direct physical evidence connecting Mr. Steele with the victims, and was emphasized by the prosecutor in arguing Mr. Steele's guilt. *See* N.T. 1450–51, 1457." *Id.* at 42. I see no need for Appellant to have repeated these assertions within every subpart of his claim attacking the presentation of this evidence, when the gist of his argument is express and apparent.[4] In my view, the finding of a deficiency in the briefing on this point, as well as several others, results from an unduly formalistic and/or compartmentalized approach to the arguments presented.

In light of the majority's holding that Appellant's counsel has forfeited seventy-percent of his claims by failing to meet briefing requirements, I note that a capital post-conviction petitioner maintains a rule-based entitlement to effective assistance of PCRA counsel on a first petition. *See Commonwealth v. Priovolosernest,* 552 Pa. 364, 368, 715 A.2d 420, 422 (1998). In capital cases in which the Court finds such perva-

I also respectfully maintain my difference with the characterization of *Commonwealth v. Albrecht,* 554 Pa. 31, 720 A.2d 693 (1998), retroactively abolishing the relaxed waiver practice in capital post-conviction cases, as "merely a clarification." Majority Opinion at 359 n. 9, 961 A.2d at 796 n. 9. While I remain bound by the decision of a majority of the Court to maintain course, I have come to regard our decision in *Albrecht* as implementing a substantial change. Further, I am not prepared to say that the retroactive abolition of an entrenched jurisprudential doctrine to the potential detriment of parties who have relied upon it does not implicate constitutional concerns. Indeed, I continue to believe that we made a mistake in directing retroactive application of *Albrecht. See Commonwealth v. Ford,* 570 Pa. 378, 398–99, 809 A.2d 325, 337–38 (2002) (Saylor, J., concurring).

4. Notably, the majority ultimately undertakes to address the argument concerning prejudice, albeit in connection with a single subpart of Appellant's claim. *See* Majority Opinion at 365–68, 961 A.2d at 800–01.

sive ineffectiveness manifest upon the face of the appellate submissions, I believe that the appropriate course is to remand for the appointment of substitute counsel. *Cf. Commonwealth v. Williams,* 566 Pa. 553, 566, 782 A.2d 517, 525 (2001) (citing *Commonwealth v. Spence,* 561 Pa. 344, 750 A.2d 303 (2000) (*per curiam*), and *Commonwealth v. Saranchak,* 559 Pa. 111, 739 A.2d 162 (1999) (*per curiam*)).

The majority does undertake to resolve, on the merits, Appellant's claim of deficient stewardship for failing to investigate and present mitigating circumstances at the penalty phase of trial. *See* Majority Opinion, *op.* at 397–411, 961 A.2d at 819–27. Initially, the majority finds sufficient evidence to sustain the PCRA court's conclusion that trial counsel conducted a reasonable investigation of Appellant's background. *See id.* at 400–01, 961 A.2d at 821. To support this conclusion, the majority relies on the investigation conducted by Michael Reid, as well as trial counsel's own investigative efforts. *See id.*

In my view, the majority's reasoning rests on an incomplete assessment of both the record and the prevailing requirements of the law. As to the record, I find it important that Reid testified that he had no experience with investigating mitigating circumstances, and that he was not asked to conduct a mitigation investigation until after the guilty verdict was rendered. *See* N.T., May 30, 2000, at 22–23, 30.[5] Notably, this occurred around noon on the day immediately preceding commencement of the penalty proceedings. According to his testimony, Reid's contact with Appellant's sister, upon which the majority relies, occurred in a public venue, namely, the lobby of the courtroom, again, immediately after the verdict. *See id.* at 25. I fail to see how a mitigation investigation in a capital case conducted under such circumstances can be deemed reasonable. *Accord People v. Towns,* 182 Ill.2d 491, 231 Ill.Dec. 557, 696 N.E.2d 1128, 1138 (1998) (citing cases for the proposition that "in a capital case, where the defendant's life is at stake, it may be objectively unreasonable for an

**5.** The majority mentions such factors in passing, as well as others discussed below, *see* Majority Opinion at 392–93, 961 A.2d at 816, but it does not appear to consider them in its actual disposition of Appellant's claim, *see id.* at 47–51.

attorney to wait until after a guilty verdict to begin to prepare for the imminent capital sentencing hearing."). Even if undertaken by an experienced professional, the timing allows insufficient time for gathering records; interviewing witnesses in an environment conducive to trust, reflection, and candid disclosure; pursuing leads as they may develop; consulting other professionals as need be; and making reasonable selection decisions concerning the evidence to be presented.[6]

Reid's testimony concerning the timing of his investigation was supported by trial counsel. *See, e.g.*, N.T., May 30, 2000, at 92–93. Further, counsel repeatedly indicated that he, himself, conducted no penalty-phase investigation. Counsel explained:

I can say that my main focus was on the trial and whether or not [Appellant] would be convicted.

That was my main focus. That was what I was focused on, not what I was going to do, you know, down the road. I certainly wasn't planning on worrying about the sentencing, I was planning on defending him, which I think I did.

N.T., May 30, 2000, at 92; *see also id.* at 93 ("My assignment was to try the guilt phase, period."); *id.* at 97 ("As I said to you, my focus was on the trial, not the penalty phase after we lose. No, I wasn't focused on that."). When asked what it is that he did before trial for purposes of the penalty phase, counsel indicated, "I, personally, probably did nothing." N.T., May 30, 2000, at 95.

While it is unknown whether predecessor counsel may have conducted a more thorough mitigation investigation, it seems reasonably clear that the one undertaken by trial counsel and Reid was insufficient in and of itself. Moreover, since an

6. The importance of a thorough life-history investigation is due to its potential impact on the penalty verdict. *See generally Penry v. Lynaugh*, 492 U.S. 302, 319, 109 S.Ct. 2934, 2947, 106 L.Ed.2d 256 (1989) (explaining that "evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse" (quoting *California v. Brown*, 479 U.S. 538, 545, 107 S.Ct. 837, 841, 93 L.Ed.2d 934 (1987) (O'Connor, J., concurring))).

appropriate investigation is a predicate to reasonable strategic choices, *see Strickland v. Washington,* 466 U.S. 668, 691–92, 104 S.Ct. 2052, 2066, 80 L.Ed.2d 674 (1984), I also differ with the PCRA court's, and the majority's, finding that this record demonstrates the exercise by trial counsel of reasonable professional judgment. *See* Majority Opinion, at 400–02, 961 A.2d at 821–22.[7]

In this case, trial counsel's ineffectiveness is also manifest on the actual record of the penalty-phase proceedings, where he berated the jurors for their guilt verdict, *see* Majority Opinion, *op.* at 381–82, 961 A.2d at 810, in the face of prosecution evidence described by the majority as overwhelming. *See id.* at 368–70, 961 A.2d at 801–02.[8] Further, counsel sarcastically encouraged the jurors to rush to judgment and left the courtroom, in complete disregard of his responsibility to his client. Particularly given this abjectly deficient stewardship, and in light of Appellant's evidentiary proffer, I believe that he was entitled to a full opportunity to develop his claim of prejudice at hearing.

At the center of this issue is the PCRA court's approach in making various credibility judgments based on written witness

7. In finding reasonable strategy, the majority also faults Appellant for failing to advise counsel of childhood abuse. *See* Majority Opinion at 402 n. 28, 961 A.2d at 822 n. 28. Counsel, however, testified that he doubted that he asked Appellant or his family about abuse. *See* N.T., May 30, 2000, at 146–47. While the majority correctly relates that information supplied by a capital defendant and his family may be relevant, it does not account for the associated principle that "[t]he onus is not upon a criminal defendant to identify what types of evidence may be relevant and require development and pursuit. Counsel's duty is to discover such evidence through his own efforts, including pointed questioning of his client." *Commonwealth v. Malloy,* 579 Pa. 425, 459, 856 A.2d 767, 788 (2004); *see also Wiggins v. Smith,* 539 U.S. 510, 525–26, 123 S.Ct. 2527, 2537–38, 156 L.Ed.2d 471 (2003) (framing the relevant inquiry in terms of counsel's duties, and not obligations on the part of the capital defendant himself or the witnesses).

8. Counsel testified that his overriding strategy in the penalty proceedings was to "try to put doubt back into [the juror's] minds." N.T., May 30, 2000, at 73; *accord id.* at 196 (reflecting counsel's characterization of residual doubt as "the only chance we had"). Even if such strategy was not ill conceived in the first instance when viewed against the Commonwealth's case for guilt, proper implementation obviously would require reasonable sensitivity to the jurors' perspective. Such sensitivity, however, clearly is lacking in trial counsel's actual performance.

declarations. *See Commonwealth v. Steele,* Nos. 686, 687, 688 of 1985, *slip op.* at 37–38, 41 (C.P.Wash. Sept. 26, 2001). This is in substantial tension with our rules, which implicate an evidentiary hearing where there are material facts in issue. *See.* Pa.R.Crim.P. 909(B). Given the breadth of the written submissions rejected by the PCRA court on credibility grounds, it seems to me that the majority strays well into uncharted territory in terms of authorizing post-conviction courts to issue summary dispositions despite factual controversy. Moreover, in the absence of a consistent direction set by this Court, it appears evident that we will continue to see disparate approaches among different PCRA judges concerning when, and to what degree, a hearing is permitted. In my view, the interests of justice would be best served by consistently requiring adherence to the core principle that, where there are disputed facts in issue, a hearing is required to permit fair development. Thus, I would remand for a supplemental post-conviction hearing.[9]

Finally, in the remand, I would permit supplementation of the post-conviction pleadings to encompass Appellant's claim under *Atkins v. Virginia,* 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002). This Court has treated similar claims of death ineligibility (which do not directly attack the underlying conviction or sentence, but rather, challenge the continued vitality of the sentence) as matters arising under state habeas corpus. *See Commonwealth v. Judge,* 591 Pa. 126, 141–42, 916 A.2d 511, 520–21 (2007).[10] Such claims are not properly

---

**9.** The majority's rejection of the mental-health evidence appears to be based, in large part, on a set of enhanced requirements for evidentiary proffers. *See* Majority Opinion at 403–07, 961 A.2d at 823–25. Notably, the asserted deficiencies are curable, and our rules of procedure reflect a policy of fair notice and an ability to remedy such matters. *See* Pa.R.Crim.P. 909(B)(2)(a). Further, although the majority repeatedly indicates that Appellant has failed to "prove" elements of his claims, *see, e.g.,* Majority Opinion at 405–06, 961 A.2d at 824, it bears repeating that he was not permitted to develop his primary proofs on an evidentiary record. Stated differently, our rules do not require a post-conviction petitioner to affirmatively prove elements at the pleading stage.

**10.** Appellant specifically argues that his *Atkins* claim is cognizable in habeas corpus, independent of the PCRA. *See* Brief for Appellant at 16–17. The majority, however, summarily declares that such claims are

subject to the PCRA's jurisdictional time deadlines. *See id.* *See generally Atkins,* 536 U.S. at 321, 122 S.Ct. at 2252 (explaining that "the [United States] Constitution 'places a substantive restriction on the State's power to take the life' of a mentally retarded offender" (quoting *Ford v. Wainwright,* 477 U.S. 399, 405, 106 S.Ct. 2595, 2599, 91 L.Ed.2d 335 (1986))). Further, I see no reason why a capital post-conviction proceeding and habeas corpus matters cannot proceed in consolidated fashion to foster efficiency. Thus, given the substantial age of this case, and as I believe that a remand is warranted in any event, I would permit supplementation as noted and require the resolution of Appellant's *Atkins* claim on a developed evidentiary record.

subject to the PCRA's one-year time bar without any developed consideration of this argument. *See* Majority Opinion at 380, 961 A.2d at 809.